# IN THE SUPREME COURT OF TEXAS

════════

No. 15-1008

════════

CITY OF RICHARDSON, TEXAS, PETITIONER,

v.

ONCOR ELECTRIC DELIVERY COMPANY LLC, RESPONDENT

════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

════════════════════════

**Argued September 12, 2017**

JUSTICE GREEN delivered the opinion of the Court.

JUSTICE BLACKLOCK did not participate in the decision.

This case involves a dispute between a city and a utility over who must pay relocation costs to accommodate changes to public rights-of-way. The City of Richardson negotiated a franchise agreement with Oncor Electric Delivery Company LLC, requiring Oncor to bear the costs of relocating its equipment and facilities to accommodate changes to public rights-of-way. Richardson later approved the widening of thirty-two public alleys. Oncor refused to pay for the relocation of its equipment and facilities to accomodate these changes. While the relocation dispute was pending, Oncor filed an unrelated case with the Public Utility Commission (PUC), seeking to alter its rates. That case was resolved by settlement, and the resulting rate change was filed as a tariff with the

PUC. Richardson enacted an ordinance consistent with the tariff, which included the following pro-forma provision: "Retail Customer, or the entity requesting such removal or relocation, shall pay to Company the total cost of removing such Delivery System Facilities." Oncor relied on this language to support its refusal to pay relocation costs.

We must decide whether a pro-forma provision in a tariff, which sets the rates and terms for a utility's relationship with its retail customers, trumps a prior franchise agreement, which reflects the common law rule requiring utilities to pay public right-of-way relocation costs. We conclude that the provision at issue does not conflict with either the prior franchise agreement or the common law and that the franchise agreement controls as to the relocation costs at issue. Accordingly, we reverse the judgment of the court of appeals and reinstate the trial court's judgment in favor of Richardson.

## I. Background

In 2002, the Public Utility Regulation Act (PURA), which established a comprehensive regulatory system for public utilities, was amended to implement a competitive retail market for electricity in Texas. Public Utility Regulation Act, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2558 (current version at TEX. UTIL. CODE. tit. 2); *Oncor Elec. Delivery Co. LLC v. Pub. Util. Comm'n of Tex.*, 507 S.W.3d 706, 708 (Tex. 2017). PURA requires each electricity utility to separate its business activities into three units: (1) a power generation company,[1] (2) a retail electric

---

[1] "'Power generation company' means a person . . . that (A) generates electricity that is intended to be sold at wholesale . . . ; (B) does not own a transmission or distribution facility in this state . . . ; and (C) does not have a certified service area . . . ." TEX. UTIL. CODE §31.002(10).

2

provider,[2] and (3) a transmission and distribution utility (TDU).[3] TEX. UTIL. CODE §39.051(b).

Under PURA, TDUs continue to be regulated by the PUC following deregulation. *Id.* § 33.001

(establishing the PUC's jurisdiction over an electric utility); *id.* § 31.002(6) (defining "electric

utility" to include TDUs, but expressly excluding power generation companies and retail electric

providers); *Oncor*, 507 S.W.3d at 709. Oncor is a TDU created as part of TXU Electric Company's

unbundling. *Oncor*, 507 S.W.3d at 709–10.

As a home-rule city, Richardson has "exclusive original jurisdiction over the rates,

operations, and services of an electric utility in areas in the municipality," which is in Dallas and

Collin Counties, as well as "exclusive control over and under the public highways, streets, and alleys

of the municipality." TEX. UTIL. CODE § 33.001; *see* TEX. TRANSP. CODE § 311.001. This exclusive

jurisdiction over electric utilities and public rights-of-way gives home-rule cities authority to grant

franchises to utilities for the transmission and distribution of electricity, by which a utility obtains

use of a city's streets, alleys, highways, and public grounds. TEX. UTIL. CODE §§ 14.008, 33.001;

TEX. TRANSP. CODE § 311.071. A utility's use of these public rights-of-way is "subject to the

direction of the governing body of the municipality." TEX. UTIL. CODE §181.043.

In 2006, pursuant to this statutory authority, the Richardson City Council approved

Ordinance No. 3559 (the "Franchise Ordinance"), granting TXU Electric Delivery Company,

predecessor to Oncor, a franchise to use Richardson's public rights-of-way for the transmission and

---

[2] "'Retail electric provider' means a person that sells electric energy to retail customers in this state. A retail electric provider may not own or operate generation assets." TEX. UTIL. CODE §31.002(17).

[3] "'Transmission and distribution utility' means a person . . . that owns or operates for compensation in this state equipment or facilities to transmit or distribute electricity . . . ." TEX. UTIL. CODE §31.002(19).

3

distribution of electric power. As required to make the franchise effective, TXU formally accepted the Franchise Ordinance in writing; therefore, the Franchise Ordinance, along with TXU's written acceptance, became the Franchise Contract.[4]

By nature, a franchise agreement represents the unique conditions a city requires of a utility in exchange for the utility's right to operate within the city. Here, the Franchise Contract incorporated a conventional right-of-way ordinance (the "ROW Ordinance") requiring the utility, upon written notice from Richardson, to remove or relocate "at its own expense" any facilities placed in public rights-of-way. In pertinent part, the Franchise Contract reads:

> Chapter 20, Article V of the City Code of Ordinances [ROW Ordinance], as now existing or as the same may be adopted, supplemented, amended or revised ("Construction in the Public Rights-of-Way Ordinance"), is incorporated by reference. The Electric Delivery Utility shall comply with all ordinances, rules and regulations of the City to the extent that such City ordinances, rules and regulations do not conflict with the provisions of this Franchise. This Franchise agreement shall in no way impair the rights, obligations or remedies of the parties under [PURA], or other state or federal law. . . .
>
> . . . .
>
> The City reserves the right for any reason whatsoever to use, to change the grade of, construct, install, repair, alter, maintain, relocate, modify, close, reduce, or widen (collectively "to change") any Public Right-of-Way, within the present or future limits of the City. At the City's request the Electric Delivery Utility shall

---

[4] Texas courts construe franchise agreements established by ordinance as contracts. *See, e.g.*, *City of Houston v. Williams*, 353 S.W.3d 128, 136–37 (Tex. 2011) (recognizing that municipalities often contract with third parties through ordinance, and that when such an ordinance evidences a contract, it should be construed as one); *S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 76, 84–85 (Tex. 2003) (holding that a franchise agreement between a municipality and a gas company was "embodied" in a city ordinance, and construing that ordinance as a contract). This interpretation is not limited to this jurisdiction. *E.g.*, *City of Wichita, Kan. v. Sw. Bell Tel.*, 24 F.3d 1282, 1286–88 (10th Cir. 1994) (holding that the defendant had effectively created an enforceable contract between itself and the city by agreeing to operate its system under the terms of the ordinance).

4

relocate or remove Facilities in order to accommodate such change of any Public Right-of-Way.[5]

The incorporated ROW Ordinance reads, "If the city gives written notice, a person shall, at its own expense, temporarily or permanently remove, relocate, change, or alter the position of person's facilities that are in the public rights-of-way within 120 days . . . ."

The ROW Ordinance, and its incorporation into the Franchise Contract, is not unique. Rather, it reflects a longstanding common law principle that "a utility forced to relocate from a public right-of-way must do so at its own expense." *Sw. Bell Tel., L.P. v. Harris Cty. Toll Rd.*, 282 S.W.3d 59, 62 (Tex. 2009); *see also State v. City of Austin*, 331 S.W.2d 737, 741 (Tex. 1960) ("In the absence of assumption by the state of part of the expense, it is clear that [utilities] could be required to remove at their own expense any installations owned by them and located in public rights of way whenever such relocation is made necessary by highway improvements.").

The Legislature adopted this principle in the Texas Utilities Code. Section 37.101(c) of PURA provides that "[t]he governing body of a municipality may require an electric utility to relocate the utility's facility at the utility's expense to permit the widening or straightening of a street." TEX. UTIL. CODE § 37.101(c). Section 181.047(c) of the Utilities Code contains almost identical language: "The governing body of the municipality may require the electric utility to

---

[5] Section 2 of the Franchise Ordinance defines key terms:
"Public Rights-of-Way" shall mean streets, alleys, utility easements (other than private easements obtained by the Electric Delivery Utility) and rights-of-ways of the City and above and beneath the surface thereof as they may now or hereafter may exist, and other municipal property to the extent an electric utility is authorized by Texas Utilities Code, Sec. 181.042 to use such municipal property.
　　"Facilities" shall mean electric power lines, with all necessary or desirable appurtenances (including underground conduits, poles, towers, wires, transmission lines and other structures, and telephone and communication lines for its own use), for the purpose of supplying electricity to the City, the inhabitants thereof, and persons, firms and corporations beyond the corporate limits thereof.

relocate a pole or line, at the utility's own expense, to allow the widening or straightening of a street." *Id.* § 181.047(c).

Between 2006 and 2010, Oncor complied with this provision of the Franchise Contract. Richardson points to thirty-four instances in which Richardson asked Oncor to accommodate changes to public rights-of-way and Oncor did so at its own expense.

In 2010, Richardson approved the widening of thirty-two public alleys, requiring the relocation of approximately 150 electric utility poles and facilities (the "Alley-Relocation Project"). This time, Oncor refused to pay for the relocation, claiming it had no obligation to do so. While the cost allocation of this relocation was still in dispute, Oncor filed an unrelated case with the PUC, seeking to alter its rates, operations, and services. Tex. Pub. Util. Comm'n, Application of Oncor Elec. Delivery Co., LLC for Authority to Change Rates, Docket No. 38929 (Aug. 26, 2011). That case was resolved by a settlement negotiated between Oncor and the Steering Committee of Cities Served by Oncor (the "Steering Committee").[6] The PUC approved the settlement, and Richardson enacted Ordinance No. 3823, adopting Oncor's tariff (the "Tariff") as modified by the settlement.

"Tariff" is defined as "the schedule of a utility . . . containing all rates and charges stated separately by type of service, the rules and regulations of the utility, and any contracts that affect rates, charges, terms or conditions of service." 16 TEX. ADMIN. CODE § 25.5(131). A tariff filed with the PUC governs a utility's relationship with its customers, and it is given the force and effect of law until suspended or set aside. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 217, 222 (Tex. 2002) (holding that a filed tariff approved by the PUC is more than a "mere contract"; rather, such

---

[6] The Steering Committee is a coalition of 156 municipalities, each served by Oncor. The Steering Committee intervenes and participates in PUC proceedings that affect electric rates and services within its municipalities. It was an active participant in Oncor's rate case with the PUC.

6

a tariff "acquires the force and effect of law"). Thus, "a utility's obligations to its customers cannot exceed its duties under a filed tariff." *Id.* PURA requires electric utilities to file a tariff with the PUC, as well as with each municipality that has retained original jurisdiction over the utility. TEX. UTIL. CODE § 32.101. In keeping with this requirement, Oncor already had a tariff on file in 2006 when it negotiated the Franchise Contract with Richardson.[7]

Each tariff filed with the PUC contains certain provisions that are specific to the filing utility. However, the PUC's rules also contain a "pro-forma tariff," the provisions of which must be incorporated exactly as written into each utility's tariff.[8] 16 TEX. ADMIN. CODE § 25.214(b)–(d). In other words, every TDU in the state has the same pro-forma tariff provisions in their filed tariff.

The following provision is at issue in this case:

5.7.8   REMOVAL AND RELOCATION OF COMPANY'S FACILITIES AND METERS

Company may remove or relocate Company facilities and the Meter at Retail Customer's request unless doing so would create a safety hazard or would be incompatible with providing safe and reliable Delivery Service. Retail Customer, or the entity requesting such removal or relocation, shall pay to Company the total cost of removing or relocating such Delivery System facilities in accordance with Chapter 6 [which describes specific rates and charges].

*Id.* Oncor relied on section 5.7.8 of the Tariff to argue that it had been relieved of its duty to pay for relocation costs under the Franchise Contract. Notably, however, because of the PUC's pro-forma tariff requirement, identical language was already on file in 2006 when the parties entered into the Franchise Contract. In fact, in Oncor's response to Richardson's first requests for

---

[7] Oncor serves 402 cities in Texas. It has one tariff filed with the PUC, which is adopted by each city it serves.

[8] Under the PUC's rules, TDUs can modify Chapters 2 and 6 of the pro-forma tariff through rulemaking, but Chapters 1, 3, 4, and 5 must be used exactly as written. 16 TEX. ADMIN. CODE § 25.214(c). The language at issue appears in Chapter 5 of the pro-forma tariff. *See id.* § 25.214(d).

admission, Oncor admitted that its January 2011 Statement of Intent to change rates did not propose any revisions to the wording or application of section 5.7.8 of Oncor's tariff. Nor were any revisions proposed concerning relocations or the party to bear costs for relocations. When asked during oral argument why it paid for previous relocations under the earlier tariff, Oncor claimed that those payments were made by mistake.

Richardson sued Oncor for breach of contract, arguing that Oncor's refusal to pay relocation costs violated the Franchise Contract as well as established common law principles and Texas statutory law requiring a utility to pay for relocations from a public right-of-way. *See generally* TEX. UTIL. CODE §§ 37.101(c), 181.047(c); *Harris Cty. Toll Rd.*, 282 S.W.3d at 62 ("[U]nder the 'long-established common law principle . . . a utility forced to relocate from a public right-of-way must do so at its own expense.'"). Oncor filed a counterclaim, also alleging breach of contract. It argued that the Tariff controls in the event of a conflict between its terms and those in any other ordinance or agreement, such as the Franchise Contract. Both parties filed motions for summary judgment. The trial court granted Richardson's motion and denied Oncor's motion.

The court of appeals reversed and rendered judgment in favor of Oncor, concluding that Richardson was party to the Tariff "because it agreed to be bound by it when it enacted Ordinance No. 3823, which adopted the Tariff," ___ S.W.3d ___, ___ (Tex. App.—Dallas 2015, pet. granted), and that "section 5.7.8 of the Tariff is a law, which the 'Franchise [Contract] shall in no way affect or impair.'" *Id.* at ___. We granted Richardson's petition for review. 60 Tex. Sup. Ct. J. 650 (Apr. 3, 2017).

**II.  Standard of Review**

We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A traditional motion for summary judgment requires the moving party to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life*, 128 S.W.3d at 215–16.

On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). When the trial court grants one motion and denies the other, the reviewing court must determine all questions presented and render the judgment that the trial court should have rendered. *Id.*

### III. Analysis

As noted by the court of appeals, "[b]oth parties agree the narrow legal issue of this appeal is whether Oncor or [Richardson] is responsible for the costs of relocating Oncor's electric utility poles, wires, and related equipment in [Richardson's] public alleys so [Richardson] can widen the alleys." ___ S.W.3d at ___. In other words, we must decide whether the Tariff changed the status quo and relieved Oncor of its obligation to pay relocation costs.

Before the Alley-Relocation Project, Richardson and Oncor both operated in compliance with the Franchise Contract's requirement that Oncor bear the costs of right-of-way relocations. Now the parties rely on different sentences of the Franchise Contract, as well as contrasting interpretations of common law and PURA, each arguing that the other has to pay for the relocation. We conclude that the Tariff does not apply to the public right-of-way relocation costs at issue, and thus is not in conflict with the common law rule, statutory law governing relocations, or the

10

Franchise Contract. Therefore, with respect to the Alley-Relocation Project, the Tariff did not alter the parties' responsibilities for relocation costs, and thus the Franchise Contract controls.

## A. The Traditional Rule

The Franchise Contract is consistent with both well-established common law and PURA in requiring Oncor to pay for right-of-way relocation costs. Traditionally, a utility forced to relocate facilities from a public right-of-way is required to do so at its own expense. *Harris Cty. Toll Rd.*, 282 S.W.3d at 62. This principle—embodied in the common law, *e.g.*, *id.*, and echoed in the Utilities Code, TEX. UTIL. CODE §§ 37.101(c), 181.047(c)—is reflected in the language of the Franchise Contract, which incorporates the ROW Ordinance.

### 1. Common Law

Under the common law, a utility's right to use a city's public rights-of-way is permissive and is subordinate to the public use of such rights-of-way. *Harris Cty. Toll Rd.*, 282 S.W.3d at 62–63. This Court has traced this principle back at least as far as 1913, when we held that the effect of limiting language in a grant to telephone companies was "to declare the right of the public to be superior to the rights granted to the corporation." *Id.* at 63 (citing *Brownwood v. Brown Tel. & Tel. Co.*, 157 S.W. 1163, 1165 (Tex. 1913)). "The main purposes of roads and streets are for travel and transportation, and while public utilities may use such roads and streets for the laying of their telegraph, telephone and water lines, and for other purposes, such uses are subservient to the main uses and purposes of such roads and streets." *Id.* (quoting *City of San Antonio v. Bexar Metro. Water Dist.*, 309 S.W.2d 491, 492 (Tex. Civ. App.—San Antonio 1958, writ ref'd)).

Based on this principle, Texas has adopted the common law rule that "a utility forced to relocate from a public right-of-way must do so at its own expense." *Id.* at 62 (quoting *Norfolk*

*Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 34 (1983)).  This rule is neither new, nor is it unique to Texas.  *See Norfolk*, 464 U.S. at 35 ("Under the traditional common law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities."); *City of Austin*, 331 S.W.2d at 741 ("[I]t is clear that [utilities] could be required to remove at their own expense any installations owned by them and located in public rights of way whenever such relocation is made necessary by highway improvements.").  This Court has also cited favorably to a local government treatise, which provides:

> Under the traditional common law rule, and in the absence of an agreement or statute to the contrary, whenever state or local authorities make reasonable requests of a public utility to relocate, remove or alter its structures or facilities, the utility must bear the cost of doing so, even though the public utility may be operating pursuant to franchise from the local government.

*Harris Cty. Toll Rd.*, 282 S.W.3d at 62 (quoting 2 SANDRA M. STEVENSON, ANTIEAU ON LOCAL GOVERNMENT LAW, § 28.09[3] (2d ed. 2008)).  Indeed, that treatise also states that "[l]ocal government franchises are accepted by utilities on the *implied condition* that they will relocate their facilities at their own expense when necessary to make way for needed governmental improvements."  STEVENSON, *supra* § 28.02 (emphasis added).

### 2. Statutory Law

The Utilities Code recognizes electric utilities' right to "construct, maintain, and operate lines" in public rights-of-way, subject to the "consent of and subject to the direction of the governing body of the municipality."  TEX. UTIL. CODE §§ 181.042, 181.043(a).  Thus, as at common law, under Texas statutory law a city retains the right to set the terms of use of its public rights-of-way, including the right to require the utility to bear relocation costs.

12

PURA echoes the common law rule that utilities bear the costs of right-of-way relocation. In pertinent part, PURA provides that "[t]he governing body of a municipality may require an electric utility to relocate the utility's facility at the utility's expense to permit the widening or straightening of a street." *Id.* § 37.101(c). Similarly, section 181.047(c) of the Utilities Code provides that "[t]he governing body of the municipality may require the electric utility to relocate a pole or line, at the utility's own expense, to allow the widening or straightening of a street." *Id.* § 181.047(c).

Oncor argues that the Legislature's use of "street" and not "alley" is significant and precludes these statutes from applying to alleys. Specifically, Oncor points out that section 37.101(b) grants electric utilities the right to use "roads, streets, highways, alleys, and public property," while section 37.101(c) only requires an electric utility to relocate at its own expense to permit the widening of a "street." *Id.* § 37.101(b), (c). Oncor argues that the rules of statutory construction require us to read this exclusion in section 37.101(c) as intentional. "It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. Likewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose." *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) (citation omitted). It follows, then, that "[w]hen the Legislature employs a term in one section of a statute and excludes it in another section, the term should not be implied where excluded." *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995).

In response, Richardson contends that "'street' is a general term" that encompasses alleys and other transportation thoroughfares. *Kalteyer v. Sullivan*, 46 S.W. 288, 290 (Tex. Civ. App.—San Antonio 1898, writ ref'd n.r.e.) ("A way over land set apart for public travel in a town

13

or city is a street, no matter what it may be called. . . . 'Street' is a general term, and includes all urban ways which can be and are generally used for the ordinary purposes of travel.").[9] Richardson points to other Texas statutes to support this interpretation, albeit circuitously. By Richardson's logic, "highway" includes an "alley," TEX. TRANS. CODE § 312.001(1), and "street" includes a "highway," TEX. LOCAL GOV'T CODE § 214.131(1); therefore, "street" must necessarily include "alley."

A statute's unambiguous language controls. *Paxton v. City of Dallas*, 509 S.W.3d 247, 257 (Tex. 2017). "When a statute is clear and unambiguous . . . we do not resort to extrinsic interpretive aids, such as legislative history, 'because the statute's plain language is the surest guide to the Legislature's intent.'" *Id.* (quoting *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016)). Furthermore, words not statutorily defined bear their common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result. *Id.* at 256.

A statute is ambiguous if "its words are susceptible to two or more reasonable interpretations and we 'cannot discern legislative intent in the language of the statute itself.'" *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 41 (Tex. 2017) (quoting *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 639 (Tex. 2010)). Here, the parties disagree about whether "streets" includes "alleys" in common parlance. Oncor points to the Legislature's use of the words separately to argue that the two are entirely different, while Richardson points to a number of instances in which the terms are used interchangeably or are defined to include each other.

---

[9] *Kalteyer* describes an alley as "[a] narrow way, less in size than a street," and "if the alley is a public one, it is a highway, and, in general, is governed by the rules applicable to streets." 46 S.W. at 290.

"To determine a statutory term's common, ordinary meaning, we typically look first to [its] dictionary definitions . . . ." *Id.* at 35. One of the many dictionary definitions of "alley" is "a narrow street." *See Alley*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986); *see also Alley*, AMERICAN HERITAGE DICTIONARY OF ENGLISH LANGUAGE (5th ed. 2016). This, of course, is far from conclusive. Other dictionaries do not define "alley" as a type of street, *e.g.*, *Alley*, NEW OXFORD AMERICAN DICTIONARY (3rd ed. 2010), and Black's Law Dictionary does not define "alley" at all. *See* BLACK'S LAW DICTIONARY (10th ed. 2014). We have held that when an undefined statutory term has multiple common meanings, "it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme." *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016).

Looking to the statutory scheme, we find particularly relevant the Legislature's recognition of the broad authority afforded to home-rule cities. As a home-rule city, Richardson has "exclusive original jurisdiction over the rates, operations, and services of an electric utility in areas in the municipality," TEX. UTIL. CODE § 33.001, as well as "exclusive control over public highways, streets, and alleys of the municipality." TEX. TRANSP. CODE § 311.001(a). The Legislature explicitly recognizes home-rule cities' power to grant a franchise "to use or occupy a public street or alley of the municipality." *Id.* § 311.071. The Utility Code makes it clear that an electric utility's right to use "a state highway, a county road, a municipal street or alley, or other public property in a municipality" is subject to the consent and direction of the city. TEX. UTIL. CODE §§ 181.042–.043.

Furthermore, we have held that in the context of home-rule cities, the recognition of a specific power does not imply that the other powers are forbidden: "Home-rule cities possess the

15

full power of self government and look to the Legislature not for grants of power, but only for limitations on their power." *Dallas Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490–91 (Tex. 1993); *see also BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 13 (Tex. 2016) (noting that because a city's powers are "otherwise vested by law," the Legislature "does not grant authority to home-rule cities but only limits home-rule cities' authority"). Such a limitation exists "only when a statute speaks with 'unmistakable clarity,'" which is certainly not the case here. *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007). This is reinforced in PURA itself: "This title does not restrict the rights and powers of a municipality to grant or refuse a franchise to use the streets and alleys in the municipality." TEX. UTIL. CODE § 14.008.

Given this context, we cannot conclude that the Legislature intended to strip municipalities of their common law right to require utilities to bear relocation costs in all manner of public rights-of-way, including roads, streets, alleys, and highways. Absent greater clarity from the Legislature to abrogate this right, the Legislature's express recognition of a municipality's right to have the utility pay for the relocation on a street does not forbid a municipality from also requiring the utility to pay for a relocation along an alley, highway, or other transportation thoroughfare. *Cf. Sw. Royalties, Inc.*, 500 S.W.3d at 406 (holding that a statute was not ambiguous within the context of the statutory scheme, even though certain terms, in isolation, were subject to multiple common meanings).

### 3. The Franchise Contract

Consistent with both the common law rule and PURA, the Franchise Contract negotiated between Richardson and Oncor's predecessor dictates in no uncertain terms that Oncor must pay the

16

costs of relocation in public rights-of-way. Specifically, the Franchise Contract incorporates the ROW Ordinance (Chapter 20, Article V of the City Code of Ordinances): "If the city gives written notice, a person shall, at its own expense, temporarily or permanently, remove, relocate, change, or alter the position of person's facilities that are in the public rights-of-way within 120 days . . . ." The Franchise Contract also explicitly defines "Public Rights-of-Way" to include streets *and* alleys.

However, the Franchise Contract continues: "This franchise agreement shall in no way affect or impair the rights, obligations or remedies of the parties under [PURA], or other state or federal law." Thus, the Franchise Contract should not be read as inconsistent with PURA's relocation provisions. And if any law requires Richardson to pay relocation costs, that law would trump the Franchise Contract's inclusion of the ROW Ordinance.

Oncor argues that both PURA section 37.101(c) and the Tariff are laws requiring Richardson to pay relocation costs, and thus, either controls over the Franchise Contract and the ROW Ordinance. We disagree. As discussed above, Richardson, a home-rule city, has the full power of self-government and exclusive control over its public rights-of-way. This power includes the common law right to require utilities to pay right-of-way relocation fees to accommodate changes to public rights-of-way. This power may be limited "only when a statute speaks with 'unmistakable clarity.'" *City of Galveston*, 217 S.W.3d at 469. Neither section 37.101 of the Utilities Code nor the Tariff unmistakably requires Richardson to bear the cost of the relocation.

## B. The Tariff

Oncor argues that the Tariff controls over the Franchise Contract because it carries the weight of a state law, which the Franchise Contract "shall in no way impair." In addition, Oncor argues that the Tariff controls because it is a freely negotiated agreement that reflects Richardson's

17

consent to pay relocation expenses and discharges Oncor's relocation expense obligations under the Franchise Contract.

Under the "filed-rate doctrine," a tariff filed with and approved by an administrative agency under a statutory scheme is more than a "mere contract." *Grant*, 73 S.W.3d at 216–17, 222. Such a tariff "acquires the force and effect of law and governs [a utility]'s relationship with its customers," *id.* at 222, and it is presumed reasonable unless a litigant proves otherwise. *Id.* at 216. It follows that the Tariff might indeed trump the Franchise Contract, by virtue of the "shall in no way impair" language, if the Tariff conflicts with the Franchise Contract.

In addition, the Tariff states that "all ordinances of [Richardson] in conflict with the provisions of this ordinance be, and the same are hereby, repealed." Thus, assuming that the Tariff does represent an agreement between the parties, as Oncor contends, the Franchise Contract would be abrogated by the Tariff to the extent that the two contracts do in fact conflict. Therefore, the critical inquiry under either of Oncor's arguments is whether the Tariff conflicts with the Franchise Contract as to the parties' obligations to pay relocation expenses. We hold that it does not.

"[A] general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached." *BCCA Appeal Grp., Inc.*, 496 S.W.3d at 7. We look first, then, for a reasonable construction that harmonizes the Franchise Contract and the Tariff. In this case, a conflict between the two would limit Richardson's home-rule power to control the use of its public rights-of-way, as well as its power to widen or change those rights-of-way to accommodate public travel and transportation. We have already held that such power may be limited "only when a statute speaks with 'unmistakable clarity.'" *City of Galveston*, 217 S.W.3d at 469. Therefore, even if the Tariff carries the force and effect of law, the language

18

of the Tariff will control only if it expresses with "unmistakable clarity" the intent that Richardson pay relocation costs associated with the Alley-Relocation Project. *Id.*; *BCCA Appeal Grp., Inc.*, 496 S.W.3d at 7–8.

The language in Tariff section 5.7.8 does not unmistakably address the relocation costs at issue in this case. Both the plain language and the context of the section indicate that the provision applies to "Retail Customers." Section 5.7.8, which is found in chapter 5 (titled "Service Rules and Regulations Relating to the Provision of Delivery Service to Retail Customers"), requires that "Retail Customer, or the entity requesting such removal or relocation, shall pay to Company the total cost of removing or relocating such Delivery System facilities." Chapter 1 of the Tariff defines "Retail Customer" as "an end-use customer who purchases Electric Power and Energy and ultimately consumes it." Richardson argues that it does not meet the definition of "Retail Customer" and therefore cannot be required to pay relocation expenses under the Tariff.

Certainly a governmental entity *might* be a "Retail Customer" in other contexts, and the Tariff's definition of "Retail Customer" is broad enough to cover those contexts.[10] It is not difficult to imagine a situation in which a city requesting relocation or removal of facilities would be subject to Tariff section 5.7.8 without conflicting with the Franchise Contract or the common law rule regarding right-of-way relocations. For example, a city might request the relocation or removal of utility facilities on the grounds of a city courthouse undergoing expansion. In that instance, the city would be the "end-use customer" and would have to bear the cost of such a relocation.

---

[10] The Tariff specifies that in the context of construction services, "Retail Customer" includes "property owners, builders, developers, contractors, *governmental entities*, or any other . . . entity . . . making a request for such services to the Company." (Emphasis added).

Oncor argues that "entity requesting such removal" is broad enough to include Richardson in all situations in which Richardson requests a relocation. However, the word "such" in this provision influences our interpretation.[11] "Such" indicates that this clause necessarily references the first sentence of the provision: "Company may remove or relocate Company facilities and the Meter at *Retail Customer's* request . . . ." (Emphasis added). Because this provision relates to requests by "Retail Customers," properly defined as "end-use customers," it limits the payment obligation to the end-use customer requesting relocation to facilitate the expansion of its facilities. In a case such as this, in which a city requests a relocation of facilities to accommodate changes to its public rights-of-way in the promotion of public travel and transportation, the city is not acting as an "end-use customer." *Cf. Harris Cty. Toll Rd.*, 282 S.W.3d at 62–63 (holding that "the main purposes of roads and streets are for travel and transportation" and when a utility installs its facilities pursuant to a statutory grant, it does so on the "implied condition that the structures shall not interfere . . . with any other public use"). Of course, we do not read "entity requesting such removal or relocation" as without meaning. Rather, this language addresses a situation in which a third party, such as a general contractor, requests the relocation rather than the Retail Customer itself.

In sum, we hold that the Tariff does not express with "unmistakable clarity" an intent that Richardson pay for the sort of right-of-way relocation costs at issue in this case.[12] Instead, we

---

[11] Tariff section 5.7.8 provides, "Company may remove or relocate Company facilities and the Meter at Retail Customer's request . . . . Retail Customer, or the entity requesting *such* removal or relocation, shall pay to Company the total cost of removing or relocating such Delivery System facilities in accordance with Chapter 6 [which describes specific rates and charges]." (Emphasis added).

[12] Oncor argues that such a holding is inconsistent with *City of Allen v. Public Utility Commission of Texas*, 161 S.W.3d 195 (Tex. App.—Austin 2005, no pet.). In *City of Allen*, Oncor sought permits for projects that called for overhead line distribution within Allen's rights-of-way, which Allen denied based on city ordinances that required Oncor to place the distribution lines underground at its own expense. *Id.* at 200–02. The court of appeals held that Allen had exceeded its authority in adopting ordinances that were contrary to Chapter 5 of Oncor's pro-forma tariff. *Id.* at 208–11. Richardson argues that *City of Allen* is distinguishable from this case because it did not address a conflict between a tariff

20

construe the Franchise Contract and the Tariff in harmony with one another. The Franchise Contract controls when, as in this case, Richardson requests a relocation to accommodate changes to public rights-of-way for transportation purposes. *See City of Austin*, 331 S.W.2d at 741 (holding that utilities could be required to pay relocation costs from public rights-of-way "whenever such relocation is made necessary by highway improvements"). Under such facts, Richardson is not acting as an "end-use customer." This is consistent both with common law and Texas statutory law. The Tariff, on the other hand, controls when Richardson, acting as an end-use customer, requests a relocation for the purposes of the city's own facilities. Under the court of appeals' contrary holding, the PUC's rules, in establishing tariff provisions that are *required* for utility tariffs, effectively abolish home-rule cities' authority over public rights-of-way and give utilities unchallengeable power to demand relocation costs merely by obtaining approval of their rates. Because this language appears in every TDU's tariff, such a holding would abrogate the common law rule, adopted in PURA, under which utilities bear relocation costs when a city makes changes to public rights-of-way to promote public travel and transportation. This would allow an agency's policy-making determination to override the Legislature's policy pronouncements as well as the public policy reflected in our longstanding common law. It defies reason that the PUC's rules, promulgated to implement PURA, could abolish the Legislative recognition of a home-rule city's authority to require a utility to pay right-of-way relocation costs. *See R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011) (recognizing that we

---

and a mutually negotiated franchise contract; instead, the ordinances in *City of Allen* were unilaterally adopted by Allen. Also, Richardson argues that *City of Allen* dealt with non-standard undergrounding construction costs, for which there is no established common law or statutory rule, rather than standard relocation costs, for which the common law is well-settled. The issues raised in *City of Allen* have not been brought before this Court, and we do not decide them here.

21

give some deference to an agency's interpretation of an ambiguous statute so long as the agency's construction is reasonable).

## IV. Conclusion

We hold that section 5.7.8 of the Tariff does not conflict with the Franchise Contract's requirement that Oncor pay the right-of-way relocation costs at issue here. As a home-rule city, Richardson has exclusive control over its public rights-of-way and has authority to manage the terms of use of those rights-of-way. Richardson did so in the Franchise Contract, which is consistent both with well-established common law and with the Utilities Code in requiring a utility forced to relocate facilities from a public right-of-way to do so at its own expense. The Tariff, on the other hand, governs Oncor's relationship with its Retail Customers, and does not address Richardson's relocations to accommodate the Alley-Relocation Project. For the reasons expressed above, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

_____
Paul W. Green
Justice

Opinion delivered: February 2, 2018

22