# Supreme Court of Texas

════════

No. 24-0424

════════

In re Oncor Electric Delivery Co. LLC; Oncor Electric
Delivery Co. NTU LLC; AEP Texas Inc.; American Electric
Power Co.; CenterPoint Energy Houston Electric, LLC; and
CenterPoint Energy, Inc.,

*Relators*

═══════════════════════════════

On Petition for Writ of Mandamus

═══════════════════════════════

**Argued February 19, 2025**

JUSTICE LEHRMANN delivered the opinion of the Court.

Justice Bland and Justice Young did not participate in the decision.

After Winter Storm Uri in 2021, thousands of Texans sued participants in the Texas electricity market. This mandamus petition concerns the claims against transmission and distribution utilities (the "Utilities"). The parties dispute whether the Utilities can be liable for gross negligence and intentional nuisance based on their alleged conduct in connection with the storm and, if so, whether the plaintiffs' pleadings allege sufficient facts to survive a Rule 91a motion to dismiss. We hold that the plaintiffs do not, and as a matter of law cannot, allege

that the Utilities "created" or "maintained" a nuisance. So, the plaintiffs' intentional-nuisance claims must be dismissed with prejudice. Next, we hold that the pleadings do not sufficiently allege gross negligence. However, we conclude that the plaintiffs should have an opportunity to replead the gross-negligence claims in light of the guidance we provide in this opinion. Accordingly, we conditionally grant mandamus relief.

### I. Background[1]

In February 2021, Winter Storm Uri brought extreme winter weather to Texas, causing record-setting electricity demand and severe power shortages. As a result, the Electric Reliability Council of Texas (ERCOT) declared a "Level 3 Emergency"—its highest state of emergency. At the emergency's outset, ERCOT ordered the Utilities to "load shed," meaning cut power to some customers. The Utilities did so, leading to outages throughout the state. The Level 3 Emergency stayed in effect for four days.

Transmission and distribution utilities deliver electricity that other market participants generate and sell. Each Utility is bound by the terms of its "tariff."[2] *See* 16 TEX. ADMIN. CODE § 25.214(b). In the

---

[1] The facts here are taken from the plaintiffs' pleadings. *See* TEX. R. CIV. P. 91a.6 ("[T]he court . . . must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59.").

[2] "Tariff" has a specialized meaning in the energy context, distinct from the more common meaning of "[a] schedule or system of duties imposed by a government on imported or exported goods." *Tariff*, BLACK'S LAW DICTIONARY (12th ed. 2024).

energy context, tariffs outline various aspects of a Utility's business, including certain obligations, prohibitions, and limitations on liability. *See id.* § 25.5(129). Each tariff contains provisions specific to the Utility to which it applies. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 257 (Tex. 2018). But all tariffs on transmission and distribution utilities also contain certain pro forma provisions prescribed by the Public Utility Commission's (PUC) regulations. *Id.* at 257–58; 16 TEX. ADMIN. CODE § 25.214.[3]

The plaintiffs allege that the Utilities' conduct during Winter Storm Uri worsened the crisis and violated common-law duties, as informed by the Utilities' tariffs. In particular, they allege that the Utilities promised to roll blackouts but failed to do so, causing some homes to be without heat for days. Several residents died as a result. The plaintiffs further allege that the Utilities cut power to generators and natural-gas production facilities, decreasing electricity supply and exacerbating the power shortage; the Utilities were allegedly warned of that very risk nearly a decade earlier. Further, the Utilities allegedly lacked a plan for load shedding during a severe storm like Uri, despite knowing one was coming. To that end, the plaintiffs allege that the Utilities failed to adequately maintain a list of critical customers to whom they should not cut power and that they kept too much power on "Under Frequency Load Shed" circuits, which can only be shut off as a

---

[3] The pro forma tariff is located at 16 TEX. ADMIN. CODE § 25.214(d). For simplicity, we cite that subsection of the Administrative Code as "Pro Forma Tariff."

last resort.  Finally, the Utilities allegedly misled their customers by downplaying the situation.

After the storm, thousands of plaintiffs brought hundreds of suits against participants in the Texas electricity market, including ERCOT, natural-gas companies, power generators, retail electric providers, and transmission and distribution utilities.[4]  The plaintiffs asserted claims of negligence, gross negligence, tortious interference with contract, civil conspiracy, negligent nuisance, strict-liability nuisance, and intentional nuisance.  The cases were transferred to a multidistrict litigation pretrial court, which designated several bellwether cases for initial motions.

ERCOT filed a plea to the jurisdiction based on governmental immunity, and all the defendants moved for dismissal under Rule 91a, which authorizes a motion "to dismiss a cause of action on the grounds that it has no basis in law or fact."  TEX. R. CIV. P. 91a.1.  The trial court dismissed the claims against the retail electric providers, the gas producers, and ERCOT.  The claims against those defendants were then severed and are not before us.  As to the power generators and the transmission and distribution utilities, the trial court dismissed the tortious-interference and civil-conspiracy claims.  That left only the claims against the Utilities and the power generators for negligence, gross negligence, and nuisance.

---

[4] The defendant transmission and distribution utilities—which are the relators in this mandamus proceeding—are Oncor Electric Delivery Co., LLC; Oncor Electric Delivery Co. NTU LLC; AEP Texas Inc.; American Electric Power Co., Inc.; CenterPoint Energy Houston Electric, LLC; and CenterPoint Energy, Inc.

4

The Utilities filed a petition for writ of mandamus in the court of appeals, seeking dismissal of the remaining claims. The court of appeals conditionally granted partial relief and ordered dismissal of the negligence, negligent-nuisance, and strict-liability nuisance claims but allowed the gross-negligence and intentional-nuisance claims to proceed. 694 S.W.3d 789, 803 (Tex. App.—Houston [14th Dist.] 2024, orig. proceeding). The Utilities now seek mandamus relief in this Court, arguing that we should order the trial court to dismiss the two remaining claims against them.[5]

## II. Discussion

Mandamus relief is proper when the respondent "clearly abused its discretion" and the relator has "no adequate remedy by appeal." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004). "When a trial court fails 'to analyze or apply the law correctly,' it has clearly abused its discretion." *In re Sherwin-Williams Co.*, 668 S.W.3d 368, 370 (Tex. 2023) (quoting *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)). And a party has no adequate remedy by appeal "when the trial court abuses its discretion in denying a Rule 91a motion to dismiss," *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 266 (Tex. 2021), particularly where, as here, mandamus relief would

---

[5] The power generators filed a separate mandamus petition, which was assigned to a different court of appeals. That court conditionally granted relief requiring dismissal of all claims against the power generators. *See In re Luminant Generation Co.*, 711 S.W.3d 13, 18 (Tex. App.—Houston [1st Dist.] 2023, orig. proceeding [mand. pending]). The plaintiffs filed mandamus petitions in this Court challenging that order. Those petitions remain pending and are not before us here.

5

determine the fate of hundreds of suits by thousands of plaintiffs, *see In re E.I. du Pont de Nemours & Co.*, 92 S.W.3d 517, 524 (Tex. 2002); *CSR Ltd. v. Link*, 925 S.W.2d 591, 596 (Tex. 1996). Accordingly, we focus on the abuse-of-discretion prong in evaluating the Utilities' request for mandamus relief.

The Utilities argue that the trial court should have dismissed the intentional-nuisance and gross-negligence claims for several reasons. First, as to gross negligence, the Utilities assert they had no applicable common-law duty and, even if they did, the plaintiffs failed to allege sufficient facts to survive a Rule 91a motion. TEX. R. CIV. P. 91a.1 ("A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them do not entitle the claimant to the relief sought."). Next, the Utilities argue that they did not create or maintain a condition that could constitute a nuisance, foreclosing the plaintiffs' intentional-nuisance claim. Finally, they contend that the pro forma tariff's force majeure provision bars both claims. As discussed below, we hold that the pleadings are insufficient as to both the intentional-nuisance and gross-negligence claims. Accordingly, we do not address the duty and force majeure issues.

### A. Intentional Nuisance

We begin with intentional nuisance. A "defendant may be held liable . . . based on proof that he intentionally created or maintained" a nuisance. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 604–05 (Tex. 2016). A "nuisance" is "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable

6

discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Id.* at 593.

This Court has recognized intentional-nuisance liability where the defendant is a *source* of a nuisance, not where it simply failed to protect against one. *See, e.g.*, *id.* at 592 n.5 (listing examples of nuisance, including "*operating*," "*maintaining*," or "*construction . . . of*" certain facilities (emphases added)); *id.* at 605–06 (providing, as an example of intentional nuisance, opening a valve and thereby releasing contaminants); *cf. Keenan v. Robin*, 709 S.W.3d 595, 603 (Tex. 2024) ("[A]ny permanent structure or purpresture which materially encroaches upon a public street and impedes travel is a nuisance per se . . . ." (alteration in original) (quoting *Joseph v. City of Austin*, 101 S.W.3d 381, 385 (Tex. App.—Austin 1936, writ ref'd))). Of course, that is not to say that something cannot be an intentional nuisance just because natural forces play a role. *See, e.g.*, *Crosstex*, 505 S.W.3d at 592 (recognizing that a nuisance could involve, among other things, "water, stones, . . . smoke, dust, odors, gases"). But for intentional-nuisance liability to attach, the defendant must in some way have been a source of the nuisance.

The alleged "nuisance" here is prolonged freezing temperatures during Winter Storm Uri. The allegations do not suggest that the Utilities created or exacerbated the cold temperatures or affirmatively maintained them. Rather, the plaintiffs complain that the Utilities failed to adequately respond to and mitigate the harm caused by those temperatures. That is not a basis for an intentional-nuisance claim.

7

Accordingly, the intentional-nuisance claims against the Utilities must be dismissed.

## B. Gross Negligence

We next address the gross-negligence claims. The Utilities argue those claims fail both because (1) the Utilities have no common-law duty under the circumstances alleged and (2) the allegations regarding the Utilities' conduct, even if true, do not rise to the level of gross negligence. As noted above, we focus on the second point.

Rule 91a authorizes dismissal of a cause of action "if the allegations, taken as true, together with inferences reasonably drawn from them do not entitle the claimant to the relief sought" or if "no reasonable person could believe the facts pleaded." TEX. R. CIV. P. 91a.1. In deciding a Rule 91a motion, we construe the allegations liberally in the plaintiffs' favor, *In re Facebook, Inc.*, 625 S.W.3d 80, 98 (Tex. 2021), and consider only "the pleading of the cause of action" and certain pleading exhibits, TEX. R. CIV. P. 91a.6. To survive a Rule 91a motion, a plaintiff's pleadings must include the "essential factual allegations supporting [the] claims," and those allegations "must be sufficient to support a judgment if ultimately proven." *In re First Rsrv. Mgmt., L.P.*, 671 S.W.3d 653, 662 (Tex. 2023).

"Gross negligence has both an objective and a subjective component." *Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019) (quoting *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012)). "First, 'viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to

8

others.'" *Id.* (quoting *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001)). "Second, 'the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.'" *Id.* (quoting *Lee Lewis Constr.*, 70 S.W.3d at 785); *see also Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (requiring that "the defendant knew about the peril, but its acts or omissions demonstrated that it did not care" (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998))). "The defendant need not have anticipated the precise manner of harm or to whom the injury would befall to have had awareness of the extreme risk." *Medina*, 593 S.W.3d at 248.

The core allegations here, construed liberally in the plaintiffs' favor, are as follows:

- The Utilities decided where to cut power and how to rotate outages. They promised to rotate outages but did not do so, leaving some homes without power for days.

- The Utilities had no rational plan for load shedding during this kind of event. Rather, they "proceed[ed] ad hoc." In some cases, critical infrastructure lost power. And there were large discrepancies in service.

- The Utilities cut power to consumers involved in electricity production, including in the Permian Basin, despite having been warned a decade earlier to avoid doing so. This contributed significantly to the outages.

- The Utilities have sole discretion to maintain lists of critical infrastructure, to prepare and maintain forms designating critical customers, and to provide those forms to customers. The Utilities could have maintained the lists adequately, as made evident by at least one Utility's nearly five-fold increase in facilities on its "critical" list within just a few days after the storm began. "[M]ore than half of the state's natural gas

9

supplies were knocked off-line by power losses, causing as much as 20% of the total power outages" during Winter Storm Uri.

- The Utilities had too much load connected to Under Frequency Load Shed circuits, which they could not turn off except as a last resort.

- The Utilities falsely promised rolling blackouts and misleadingly downplayed the situation.

The plaintiffs further allege that the Utilities knew severe cold weather was coming for several days before the storm hit. And an earlier ERCOT report anticipated possible "extreme" weather conditions during the 2020–2021 winter season. Winter peak demand in January 2018 was 65,915 megawatts, and ERCOT forecast that the number would grow by between 1,000 and 3,000 megawatts per year. Peak demand during the storm was 69,692 megawatts. Based on those allegations, construed liberally, the peak demand during Winter Storm Uri was foreseeable.

These allegations are serious. But, even assuming they are true, standing alone they do not support an inference that the Utilities' conduct amounted to gross negligence. First, to the extent the plaintiffs argue that the Utilities were grossly negligent in their initial response to ERCOT's load-shed orders, the pleadings do not support that contention. ERCOT announced a "Level 3" Energy Emergency and ordered substantial blackouts "to prevent grid collapse." Unsurprisingly, during a Level 3 Emergency, the Utilities are required to follow ERCOT's load-shed orders "without delay." ERCOT Nodal Operating Guide § 4.5.3(7); *see* TEX. UTIL. CODE § 39.151(j) (requiring transmission and distribution utilities to follow ERCOT guidelines).

10

The Utilities therefore had to implement widespread blackouts very quickly. To the extent the plaintiffs complain about the Utilities' actions in those moments, they have failed to allege facts that could amount to conscious indifference. *See Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993) (explaining that "momentary thoughtlessness, inadvertence, or error of judgment" does not rise to the level of conscious indifference (quoting *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 915 (Tex. 1981))). The plaintiffs have nowhere alleged facts supporting an inference that the Utilities were not doing the best they could in those time-sensitive circumstances.

But that does not necessarily foreclose the conclusion that the Utilities' conduct rose to the level of grossly negligent at other times before or in the aftermath of the initial load-shed orders. The plaintiffs argue that the Utilities' failure to adequately plan for Winter Storm Uri and their acts and omissions in the hours and days following the initial response also constitute gross negligence. Even in normal times, "[c]ontinuous service by a public utility is essential to the life, health, and safety of the public." TEX. UTIL. CODE § 186.002(a), (c)(1). And ERCOT, in a "system[-]wide resource adequacy plan" available to the Utilities, anticipated "extreme" weather during the 2020–2021 winter season, producing operating reserve margins low enough to require "system-wide blackouts." *See Ellender*, 968 S.W.2d at 922 (relying on evidence that an extreme risk was "common knowledge" in the defendant's industry to establish objective component of gross negligence).

11

However, at this point, the plaintiffs have not sufficiently alleged that the Utilities "proceed[ed] in conscious indifference to the rights, safety, or welfare of others," *Medina*, 593 S.W.3d at 247 (quoting *Lee Lewis Constr.*, 70 S.W.3d at 785), or that they "knew about the peril, but [their] acts or omissions demonstrated that [they] did not care," *Boerjan*, 436 S.W.3d at 311 (quoting *Ellender*, 968 S.W.2d at 921). In particular, given that the Utilities were legally obligated to operate—both before and after Winter Storm Uri—in compliance with ERCOT guidelines and other applicable law, an allegation of gross negligence must account for the legal constraints governing the Utilities at the time. In other words, at a minimum, the plaintiffs must allege that the Utilities' alleged grossly negligent acts and omissions were a choice made with conscious indifference to the rights, safety, or welfare of others and were not taken to comply with a legal obligation or a reasonable belief about a legal obligation.

The Utilities Code makes very clear that transmission and distribution utilities are obligated to comply with ERCOT guidelines, which have the force and effect of law:

> A . . . transmission and distribution utility . . . shall observe all scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, and procedures established by the independent system operator in ERCOT. Failure to comply with this subsection may result in the revocation, suspension, or amendment of a certificate . . . or in the imposition of an administrative penalty . . . .

TEX. UTIL. CODE § 39.151(j); *see also* Pro Forma Tariff ch. 1 (defining "Applicable Legal Authorities" to include a "guide or guideline of [ERCOT]"); *id.* § 3.3 ("The provision of Delivery Service . . . is subject

12

to . . . Applicable Legal Authorities."). Accordingly, we may and should consider those guidelines at the Rule 91a phase. *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 656 (Tex. 2020) ("Rule 91a limits a court's factual inquiry to the plaintiff's pleadings but does not so limit the court's legal inquiry.").

When a defendant reasonably believed its alleged misconduct was necessary to comply with applicable guidelines (even when they do *not* have the force and effect of law), a plaintiff alleging conscious indifference must generally demonstrate that the defendant "should have disregarded the [g]uidelines . . . and that . . . failure to do so showed that [the defendant] was consciously indifferent." *Marsillo v. Dunnick*, 683 S.W.3d 387, 395 (Tex. 2024). In effect, if a defendant's complained-of acts or omissions were plausibly required by applicable guidelines, and the defendant followed those guidelines, a presumption arises that the defendant was not consciously indifferent. *See id.* Here, the plaintiffs have made no effort to allege that the Utilities could have acted differently while still complying with the ERCOT guidelines. Of course, at the pleadings stage, the plaintiffs do not have to individually address every potentially applicable legal requirement or guideline. But neither can they adequately allege conscious indifference while ignoring the highly relevant and restrictive guidelines that limited the Utilities' options in this extreme emergency.

The plaintiffs acknowledge that Winter Storm Uri was a "crisis." The Utilities acted—at least in part—to comply with ERCOT orders, to preserve the grid, and to prevent even more widespread potential outages. The Utilities' options were certainly limited, perhaps

13

considerably so, by the guidelines they were required to follow. If the plaintiffs' theory of the case is that the Utilities could have satisfied their legal obligations and simultaneously taken concrete steps to mitigate the deaths and injuries that ensued, they must allege facts to support such an inference. In short, they need to allege that the Utilities could have reduced the deaths and injuries that resulted from the storm despite applicable legal requirements but nevertheless proceeded as they did with conscious indifference to the rights, safety, or welfare of others.

We emphasize that our discussion is limited to gross-negligence claims and stems from the impact of a defendant's compliance with applicable laws, regulations, or guidelines on the plaintiff's ability to establish conscious indifference. *See Marsillo*, 683 S.W.3d at 395. And even in this context, we do not suggest that plaintiffs must identify and individually plead around every requirement or guideline that might somehow constrain a defendant's conduct. But the plaintiffs here needed to allege that the Utilities, in implementing ERCOT's load-shed orders, could have meaningfully acted differently and thereby lessened the injuries that resulted from Winter Storm Uri despite the applicable legal restrictions. In other words, they must at least allege that the Utilities could have reduced the injuries the storm caused while complying with applicable legal requirements and guidelines and yet chose not to do so, demonstrating conscious indifference to the resulting injuries. *See First Rsrv.*, 671 S.W.3d at 662 (holding the pleadings' factual allegations "must be sufficient to support a judgment if ultimately proven").

14

Because the pleadings are insufficient in their current form, the trial court's order must be vacated insofar as it denied the Utilities' motion to dismiss the gross-negligence claims against them. However, given our clarification of the law regarding conscious indifference, and because "[m]andamus is discretionary and 'controlled by equitable principles,'" *id.* at 663 (quoting *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993)), we conclude the plaintiffs should be given an opportunity to replead the gross-negligence claims against the Utilities. *See, e.g., Dohlen v. City of San Antonio*, 643 S.W.3d 387, 398–99 (Tex. 2022) (reversing a court of appeals judgment that dismissed the case for lack of jurisdiction where the pleadings did not sufficiently allege waiver of immunity, but allowing plaintiffs an opportunity to replead).

## III. Conclusion

We hold that because the plaintiffs' pleadings failed to adequately allege intentional nuisance and gross negligence, the trial court erred in denying the Utilities' Rule 91a motion seeking dismissal of those claims. Accordingly, we conditionally grant mandamus relief and order the trial court to vacate its order denying the motion. We further order the trial court to dismiss the intentional-nuisance claims with prejudice and to provide the plaintiffs an opportunity to replead their gross-negligence claims in an amended petition. A writ will issue only if the trial court fails to comply.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 27, 2025

15