**Opinion issued August 27, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00536-CV

_____

**STARNET INSURANCE COMPANY, Appellant**

**V.**

**RICETEC, INC., Appellee**

On Appeal from the 239th District Court
Brazoria County, Texas
Trial Court Case No. 94416-CV

# O P I N I O N

In this permissive interlocutory appeal, appellee, RiceTec, Inc., brought claims for breach of contract and breach of the Prompt Payment Act against appellant, StarNet Insurance Company, arising out of StarNet's failure to provide

RiceTec a defense in a property damage lawsuit filed against RiceTec. The parties filed cross motions for summary judgment on the question of whether the insurance policy StarNet issued to RiceTec covered the lawsuit filed against RiceTec, such that StarNet owed RiceTec a duty to defend. The trial court rendered an interlocutory summary judgment order ruling that StarNet owed RiceTec a duty to defend. The trial court granted permission for StarNet to file a petition for permissive interlocutory appeal of the ruling, and this Court granted the petition for permissive appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d); TEX. R. APP. P. 28.3.

On appeal, StarNet argues that the trial court erred in granting RiceTec's motion for summary judgment and in denying its own motion for summary judgment on the issue of whether it owed RiceTec a duty to defend. StarNet argues that the plain language of an endorsement to the policy excludes coverage for the claims at issue in the property damage lawsuit against RiceTec and therefore StarNet does not owe a duty to defend RiceTec in that lawsuit.

We reverse and remand.

## Background

### A. *The Insurance Policy*

RiceTec is a company that produces and sells rice seeds. StarNet issued a commercial general liability insurance policy (the Policy) to RiceTec that covered a period from February 15, 2015, through February 15, 2016. The Policy had a limit

2

of $1,000,000 per occurrence and a general aggregate limit of $2,000,000. The Policy provided:

**1. Insuring Agreement**

**a.** We [StarNet] will pay those sums that the insured [RiceTec] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

. . . .

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred in whole or in part. . . .

The Policy defined "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time"; "coverage territory" as including "the United States of America"; "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful

3

conditions"; and "suit" as "a civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." The Policy defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured."

The Policy included multiple exclusions which set out situations in which the insurance coverage provided by StarNet to RiceTec did not apply. The Policy stated, in relevant part:

**2. Exclusions**

This insurance does not apply to:

. . . .

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

. . . .

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

. . . .

**j. Damage to Property**

4

"Property damage" to:

. . . .

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;

. . . .

The Policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

The Policy also included numerous endorsements. At issue in this case is the Agricultural Chemicals Applicator Coverage endorsement (the Endorsement). Under the Endorsement, the "per occurrence limit" was $25,000, the "annual aggregate" was $50,000, and the per-occurrence deductible for property damage was $5,000. The Endorsement then provided:

With respect to the "bodily injury" or "property damage" arising out of the application of herbicides, pesticides, fertilizers or similar agricultural chemicals, **(1)(d)** of **Exclusion f. Pollution** under **Section I – Coverage A – Bodily Injury and Property Damage Liability** and **(5)** of **Exclusion j. Damage to Property** of **SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** do not apply.

However, coverage provided by this endorsement is excluded for any "bodily injury" or "property damage" resulting from:

. . . .

5

**5.** The application of herbicides, pesticides, fertilizers or similar agricultural chemicals by aircraft owned, operated by, rented or loaned to you or by any non-owned aircraft.

. . . .

## B.     *The Dishman Lawsuit*

On September 15, 2015, Zachary Dishman, Josey Dishman, and Dishman Rice Farms Partnership (collectively, the Dishmans) filed suit against RiceTec and other defendants in Jefferson County, Texas (the Dishman lawsuit). The Dishmans alleged that, beginning on April 23, 2015, RiceTec, through its agent, fellow defendant Twin County Air-AG, Inc., "commenced the aerial spraying of herbicide on RiceTec-farmed plots of land adjacent to [the Dishmans'] Property" and the herbicide "was over sprayed, drifted or otherwise came onto" the Dishmans' property. The Dishmans alleged that the herbicide sprayed on behalf of RiceTec "killed or damaged" approximately 742 acres of the Dishmans' rice crop, causing over $1,000,000 in damages.

The Dishmans asserted causes of action against RiceTec for negligence and trespass, and they also alleged that the aerial spraying of herbicide constituted an "inherently or intrinsically dangerous or ultra-hazardous activity" that caused harm to the Dishmans. The Dishmans later amended their petition to add a cause of action for gross negligence, alleging that Twin County Air-AG, acting on behalf of RiceTec, commenced aerial spraying of herbicide on RiceTec's property on April

6

23 and April 25, 2015. The Dishmans alleged that the "herbicide supplied by RiceTec, Inc. was sprayed, over sprayed, drifted, or was otherwise allowed . . . to come onto" the Dishmans' property. They alleged that because RiceTec had sold the Dishmans the seed used to plant their rice crop, RiceTec had knowledge of the Dishmans' farming activities, RiceTec's decision to use aerial spraying of herbicide on its property "involved an extreme degree of risk [to the Dishmans] considering the probability and magnitude of the potential harm to [the Dishmans'] young rice crop," and RiceTec commenced aerial spraying with conscious indifference to the Dishmans' rights.

RiceTec notified StarNet of the Dishman lawsuit.[1] On December 1, 2015, StarNet denied coverage for the claims asserted against RiceTec. In the letter informing RiceTec of the denial of coverage, StarNet set out multiple provisions of the Policy that it believed were relevant to its decision, including the Endorsement. StarNet stated:

> After review of the complaint [in the Dishman lawsuit] we have determined that the allegations do not meet the coverage terms within your policy. The allegations address property damage resulting from an agricultural application performed by Twin County Air-AG.
>
> As we previously discussed, there is an exclusion within an attached endorsement to your policy. Endorsement – Agricultural Chemicals Applicator Coverage further states that coverage provided by the

---

[1] Although there is no supporting documentation in the record, both parties note in their appellate briefs that the parties in the Dishman lawsuit reached a settlement agreement in January 2019.

endorsement is excluded relative to the application of herbicides, pesticides, fertilizers or similar agricultural chemicals by aircraft owned, operated by, rented or loaned to you or by any non-owned aircraft.

StarNet declined to make any defense or indemnity payments under the Policy.

On July 31, 2017, counsel for RiceTec requested that StarNet reconsider its decision to deny coverage. Two months later, StarNet denied the request for reconsideration, stating that it "remains of the position that there is no coverage under the StarNet policy for the claims that have been asserted against RiceTec in the [Dishman] lawsuit." StarNet stated in this letter:

> [The Endorsement] affixed to the StarNet policy does not serve to grant coverage. Instead, with respect to claims of bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers, or similar agricultural products, the endorsement merely provides that subsection f.(1)(d) of the Pollution Exclusion set forth in the StarNet policy shall not serve to negate coverage. The endorsement then sets forth five situations in which there shall be no coverage for claims for bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers, or similar agricultural products regardless of whether subsection f.(1)(d) of the Pollution Exclusion set forth in the StarNet policy is otherwise applicable, including "[t]he application of herbicides, pesticides, fertilizers or similar agricultural chemicals by aircraft owned, operated by, rented or loaned to you or by any non-owned aircraft." In sum, Exclusion 5. in the [Endorsement] merely confirms that, although there may be coverage for some claims for bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers, or similar agricultural products, there can be no such coverage for any such claims if the application was accomplished by aerial means.

StarNet stated that its position was that the Endorsement "effectively and unequivocally serves to negate insurance coverage under the StarNet policy for the claims that have been asserted against RiceTec" in the Dishman lawsuit.

## C.     *The Underlying Proceedings*

On November 30, 2017, RiceTec filed the underlying suit against StarNet in Brazoria County. RiceTec asserted that the allegations in the Dishman lawsuit did "not support application of any exclusions or limitations to coverage under the StarNet Policy" and that, based on the allegations in the Dishman lawsuit and the unambiguous language of the Policy, "StarNet is obligated to defend RiceTec in the *Dishman* Lawsuit and to reimburse RiceTec's defense costs." RiceTec brought a breach of contract claim against StarNet, alleging that, under the Policy, StarNet had a duty to defend RiceTec in the Dishman lawsuit and breached that duty when it refused to defend RiceTec. RiceTec also asserted a claim against StarNet under the Prompt Payment Act—Texas Insurance Code chapter 542—alleging that it was entitled to payment by StarNet of its defense costs in the Dishman lawsuit and that StarNet violated Insurance Code section 542.060 by failing to acknowledge that it owed obligations to RiceTec under the Policy.[2] RiceTec also sought declarations that

---

[2]     *See* TEX. INS. CODE ANN. § 542.060(a) ("Except as provided by Subsection (c), if an insurer that is liable for a claim under an insurance policy is not in compliance with this subchapter [addressing prompt payment of claims], the insurer is liable to pay the holder of the policy . . . , in addition to the amount of the claim, interest on

StarNet had a duty to defend it for the claims asserted in the Dishman lawsuit and a duty to reimburse it for the defense costs it had incurred.

StarNet answered and asserted affirmative defenses. It acknowledged that it had issued an insurance policy to RiceTec, but it alleged that the Policy "contain[ed] or incorporate[d] certain provisions, exclusions, and endorsements that preclude or limit coverage, in whole or in part." StarNet alleged that several Policy exclusions, including exclusions f (pollution) and j (damage to property), applied and precluded coverage of the claims asserted in the Dishman lawsuit. StarNet also alleged that, under the Endorsement, it had no duty to defend or indemnify RiceTec in the Dishman lawsuit.

RiceTec moved for traditional summary judgment on all of its claims. RiceTec argued that it was entitled to judgment as a matter of law because the claims asserted against it in the Dishman lawsuit were covered under the unambiguous language of the Policy. Specifically, RiceTec argued that the Policy applied to property damage—defined as "physical injury to tangible property"—caused by an "occurrence" that takes place in the "coverage territory"—defined as including the United States of America—during the policy period. The Dishman lawsuit alleged that RiceTec damaged the Dishmans' rice crops by negligently spraying the crops

the amount of the claim at the rate of 18 percent per year as damages, together with reasonable and necessary attorney's fees.").

with herbicide in April 2015, during the policy period. RiceTec argued that because the claims asserted against it in the Dishman lawsuit potentially fell within the scope of coverage provided by the Policy, StarNet owed RiceTec a duty to defend as a matter of law.

RiceTec also argued that none of the Policy's exclusions—including the pollution and the damage to property exclusions—applied to bar coverage under the Policy. RiceTec further argued that the Endorsement did not preclude coverage of the claims in the Dishman lawsuit. RiceTec argued that the Endorsement "serves to provide only certain limited coverage where coverage would otherwise be excluded by section (1)(d) of exclusion f (Pollution) or section (5) of exclusion j (Damage to Property)," but neither of those exclusions was applicable to the claims asserted in the Dishman lawsuit. RiceTec also argued that the Endorsement stated that "coverage provided by this endorsement is excluded for any 'bodily injury' or property damage' resulting from [t]he application of herbicides, pesticides, fertilizers or similar agricultural chemicals by aircraft owned, operated by, rented or loaned to you or by any non-owned aircraft," but the Endorsement did not state that it "negates coverage that the underlying policy already provides," and the coverage that RiceTec sought was provided by the Policy, not the Endorsement.

Finally, RiceTec argued that StarNet had a "clear and unqualified duty to defend" it in the Dishman lawsuit, but had failed to fulfill this duty. RiceTec

11

requested that the trial court grant summary judgment, award damages—including attorney's fees RiceTec had incurred in the Dishman lawsuit, statutory penalties under the Prompt Payment Act, and attorney's fees in the coverage proceeding—and declare that StarNet owed RiceTec an ongoing duty to defend it in the Dishman lawsuit.

StarNet also moved for traditional summary judgment on RiceTec's claims. StarNet argued that it had no duty to defend RiceTec because the unambiguous language of the Endorsement excluded coverage for the claims asserted against RiceTec in the Dishman lawsuit. StarNet argued that the Endorsement modified the Policy by providing that, for claims for bodily injury or property damage arising out of the application of herbicides, subsection (1)(d) of the pollution exclusion and subsection (5) of the damage to property exclusion do not apply, and coverage exists for these claims under the Policy. However, the next portion of the Endorsement "operate[d] to limit the coverage provided by the first full paragraph of that endorsement" by negating the coverage provided by the Endorsement in certain situations, including in cases involving property damage resulting from the application of herbicides by aircraft. StarNet argued that, when reading the Policy and the Endorsement together, "any coverage for 'property damage arising out of the application of herbicides' is excluded if the 'property damage result[ed] from . . . [t]he application of herbicides . . . by aircraft owned, operated by, rented or

12

loaned to [RiceTec] or by any non-owned aircraft.'" Because the Dishman lawsuit alleged that the Dishmans' rice crops were damaged as a result of herbicides aerially sprayed by RiceTec and its agents, StarNet argued that the claims in the Dishman lawsuit unambiguously fell within the exclusion set out in the Endorsement, and StarNet thus had no duty to defend RiceTec in the Dishman lawsuit.

StarNet accordingly argued that RiceTec was not entitled to a declaration that StarNet had a duty to defend RiceTec in the Dishman lawsuit or that StarNet had a duty to pay RiceTec's defense costs. StarNet also argued that because it had no duty to defend RiceTec, it also had no duty to indemnify RiceTec for any settlement or judgment that might be obtained in the Dishman lawsuit. StarNet further contended that it was entitled to summary judgment on all of RiceTec's claims against it because all of RiceTec's claims were predicated on StarNet owing RiceTec a duty to defend under the Policy.

The trial court granted RiceTec's motion for summary judgment and denied StarNet's motion for summary judgment solely on the question of whether StarNet owed RiceTec a duty to defend. The trial court's order on the motions stated:

> The Court finds that the underlying petition in the *Dishman* Lawsuit alleges facts that potentially bring the alleged injury within the terms of coverage in the relevant StarNet Policy. Based on this substantive finding, the Court determines that StarNet has a duty to defend RiceTec in the *Dishman* Lawsuit.
>
> It is therefore ORDERED that:

13

1. Plaintiff RiceTec, Inc.'s Amended Motion for Traditional Summary Judgment against StarNet is GRANTED as to StarNet's duty to defend only, with the remaining issues in that motion being held for further consideration.

2. Defendant StarNet's Traditional Motion for Summary Judgment is DENIED as to StarNet's duty to defend only, with the remaining issues in that motion being held for further consideration.

3. StarNet owes RiceTec an ongoing duty to defend RiceTec from the claims against RiceTec in the *Dishman* Lawsuit.

The Court further finds that there is a controlling question of law as to which there is a substantial ground for difference of opinion regarding whether StarNet has a duty to defend RiceTec in the underlying *Dishman* Lawsuit. An immediate appeal from this order may materially advance the ultimate termination of this litigation because RiceTec's remaining damage claim for attorney's fees, expenses and penalty interest against StarNet is based upon StarNet's duty to defend.

It is therefore further ORDERED that the parties are granted permission to appeal this Order to the court of appeals as a permissive interlocutory appeal pursuant to Rule 168 of the Texas Rules of Civil Procedure and Section 51.014(d) of the Texas Civil Practice and Remedies Code.

This Court granted StarNet's petition for permissive interlocutory appeal.

**Duty to Defend**

StarNet argues that the trial court erred in granting RiceTec's motion for summary judgment and in denying its own motion for summary judgment because, under the plain language of the Policy and the Endorsement, StarNet did not owe RiceTec a duty to defend in the Dishman lawsuit.

### A.    Standard of Review

We review a trial court's ruling on a summary judgment motion de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 258 (Tex. 2018). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *City of Richardson*, 539 S.W.3d at 258–59. When a party moves for summary judgment on its own claim, it must establish each essential element of its cause of action as a matter of law. *Lawyers Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 717 (Tex. App.—Dallas 2014, pet. denied). For a defendant to be entitled to traditional summary judgment, the defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Williams v. Bell*, 402 S.W.3d 28, 35 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *see also Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017) (stating that matter is conclusively established if reasonable people could not differ as to conclusion to be drawn from evidence).

On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). When the trial court grants one summary judgment motion and denies the other, the reviewing court should

15

review both parties' summary judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered. *S. Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013); *City of Garland*, 22 S.W.3d at 356.

## B. *Determining Whether Duty to Defend Exists*

Generally, in liability insurance policies, an insurer "assumes both the duty to indemnify the insured, that is, to pay all covered claims and judgments against an insured, and the duty to defend any lawsuit brought against the insured that alleges and seeks damages for an event potentially covered by the policy, even if groundless, false or fraudulent," subject to the terms of the insurance policy. *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009). However, the duty to defend and the duty to indemnify "are distinct and separate duties," and one duty may exist without the other. *Id.* (quoting *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004)); *Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997) (per curiam) ("[A]n insurer may have a duty to defend but, eventually, no duty to indemnify."). An insurer's duty to indemnify is controlled by the "facts actually established in the underlying suit" against the insured and "whether the damages caused by the actions or omissions proven are covered by the terms of the policy." *D.R. Horton-Tex.*, 300 S.W.3d at 744. In this case, the trial court's summary judgment order states that the court granted RiceTec's summary

judgment motion and denied StarNet's motion "as to StarNet's duty to defend only, with the remaining issues in [the] motion[s] being held for further consideration." We therefore only address whether StarNet has a duty to defend RiceTec in the Dishman lawsuit, and we do not address StarNet's duty to indemnify.

In determining whether an insurer has a duty to defend, Texas courts follow the "eight corners" rule. *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014); *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 380 (Tex. 2012). Under the eight corners rule, we look to the facts alleged within the four corners of the pleadings, measure the facts alleged against the language within the four corners of the insurance policy, and determine if the facts alleged "present a matter that could potentially be covered by the insurance policy." *Ewing Constr.*, 420 S.W.3d at 33; *Evanston Ins.*, 370 S.W.3d at 380. We will not read facts into the pleadings, nor will we look outside the pleadings or imagine factual scenarios that might trigger coverage. *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 655 (Tex. 2009) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 142 (Tex. 1997) (per curiam)).

We consider the factual allegations without regard to their truth or falsity, and we resolve all doubts regarding the duty to defend in the insured's favor. *Ewing Constr.*, 420 S.W.3d at 33; *see Evanston Ins.*, 370 S.W.3d at 380 ("Our precedent favors insureds when examining both the complaint and the policy."); *Zurich Am.*

17

*Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008) ("We resolve all doubts regarding the duty to defend in favor of the duty, and we construe the pleadings liberally."). In reviewing the pleadings, we "look to the factual allegations showing the origin of the damages claimed, not to the legal theories or conclusions alleged." *Ewing Constr.*, 420 S.W.3d at 33; *see Evanston Ins.*, 370 S.W.3d at 380 ("[W]e only defer to a complaint's characterization of factual allegations, not legal theories or conclusions."). If the pleadings contain even one covered claim, the insurer must defend the entire suit. *Evanston Ins.*, 370 S.W.3d at 380; *Zurich Am. Ins.*, 268 S.W.3d at 491.

The insured has the initial burden to establish coverage under the insurance policy. *Ewing Constr.*, 420 S.W.3d at 33; *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). If the insured establishes coverage, then, to avoid liability, the insurer must prove that one of the policy's exclusions applies. *Ewing Constr.*, 420 S.W.3d at 33; *Gilbert Tex. Constr.*, 327 S.W.3d at 124. If the insurer proves the applicability of an exclusion, the burden shifts back to the insured to establish that an exception to the exclusion restores coverage. *Ewing Constr.*, 420 S.W.3d at 33; *Gilbert Tex. Constr.*, 327 S.W.3d at 124. If a petition does not allege facts within the scope of coverage under the insurance policy, the insurer is not legally required to defend a suit against its insured. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002) (quoting

18

*Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997)); *see Pine Oak Builders*, 279 S.W.3d at 654; *Gen. Star Indem. Co. v. Gulf Coast Marine Assocs., Inc.*, 252 S.W.3d 450, 454 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

We construe insurance policies "using ordinary rules of contract interpretation." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017) (per curiam). When doing so, we must determine the parties' intent "as reflected in the terms of the policy itself." *Id.* at 257–58 (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009)). We must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Id.* at 258 (quoting *Gilbert Tex. Constr.*, 327 S.W.3d at 126). No phrase, sentence, or section should be isolated from its setting and considered apart from other contractual provisions. *Id.* (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)). Unless the policy itself dictates otherwise, we "give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *Id.* (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015)).

If we determine that only one party's interpretation of the policy is reasonable, the policy is unambiguous and the reasonable interpretation should be adopted. *Id.*

If, however, we determine that both parties' interpretations are reasonable, the policy is ambiguous. *Id.* The Texas Supreme Court has held:

> In that event, "we must resolve the uncertainty by adopting the construction that most favors the insured," and because we are construing a limitation on coverage, we must do so "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."

*RSUI Indem. Co.*, 466 S.W.3d at 118 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)); *see also Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008) ("'Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured,' and '[a]n intent to exclude coverage must be expressed in clear and unambiguous language.'") (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 811 S.W.2d at 555).

"'[A]mbiguous' means more than simply 'denoting a lack of clarity in language,'" and an insurance policy is not ambiguous simply because the parties offer conflicting interpretations of the policy's provisions. *Nassar*, 508 S.W.3d at 258 (quoting *RSUI Indem. Co.*, 466 S.W.3d at 119). "A policy is ambiguous if it is genuinely subject to more than one meaning after applying the pertinent rules of contract interpretation." *Id.* When interpreting language in an insurance policy, we must determine whether the insured's interpretation is reasonable. *Id.* If it is, then

we must adopt the insured's interpretation, even if the insurer's interpretation is also, or more, reasonable. *Id.*; *RSUI Indem. Co.*, 466 S.W.3d at 119.

When construing an insurance policy, we should read the policy and its endorsements together "unless they are so much in conflict they cannot be reconciled." *TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d 264, 271 (Tex. App.—Dallas 2005, no pet.). In the case of an irreconcilable conflict, endorsements to a policy generally supersede and control over conflicting printed terms contained within the main policy. *Id.*; *see also TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 658 (Tex. App.—San Antonio 2005, no pet.) (stating that endorsements "often are issued to add coverages that otherwise would be excluded," but noting that endorsements "cannot be read apart from the main policy" and that added provisions in endorsements only supersede previous policy terms "to the extent they are truly in conflict").

## C. *Whether StarNet Owes RiceTec a Duty to Defend in the Dishman Lawsuit*

The Policy issued by StarNet to RiceTec provided that StarNet "will pay those sums that [RiceTec] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and that StarNet had the "duty to defend [RiceTec] against any 'suit' seeking those damages." The Policy further provided that "[t]his insurance applies to 'bodily injury' and 'property damage'" only if three conditions were met: (1) the bodily injury or property damage

21

was caused by an occurrence—defined in the Policy as an "accident"—that took place in the coverage territory, which included the United States; (2) the bodily injury or property damage occured during the policy period of February 15, 2015, through February 15, 2016; and (3) prior to the policy period, no insured knew that bodily injury or property damage had occurred, in whole or in part. The Policy defined "property damage" as including "[p]hysical injury to tangible property, including all resulting loss of use of that property."

The Policy then set out numerous exclusions, or instances in which insurance coverage did not apply. Exclusion f, the "Pollution" exclusion, contained subparagraph (1)(d), which provided that the Policy did not cover property damage

> arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" . . . [a]t or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

The Policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Exclusion j, the "Damage to Property" exclusion, contained subparagraph (5), providing that the Policy did not cover property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly

22

or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations."

The Policy also contained multiple endorsements, including the "Agricultural Chemicals Applicator Coverage" endorsement. The Endorsement stated, in bold letters and in all caps, "**THIS ENDORSEMENT CHANGES THE POLICY**." The Endorsement then stated that it "modifies insurance provided under the . . . COMMERCIAL GENERAL LIABILITY COVERAGE PART" of the Policy, and it set out a schedule providing a $25,000 "Per Occurrence Limit," a $50,000 "Annual Aggregate," and a $5,000 per-occurrence "Combined Bodily Injury and/or Property Damage Liability Deductible." Paragraph 1 of the Endorsement provided:

> With respect to the "bodily injury" or "property damage" arising out of the application of herbicides, pesticides, fertilizers or similar agricultural chemicals, **(1)(d)** of **Exclusion f. Pollution** . . . and **(5)** of **Exclusion j. Damage to Property** . . . do not apply.

Immediately after this provision, paragraph 2 of the Endorsement stated: "However, coverage provided by this endorsement is excluded for any 'bodily injury' or 'property damage' resulting from . . . **5.** The application of herbicides, pesticides, fertilizers or similar agricultural chemicals by aircraft owned, operated by, rented or loaned to you or by any non-owned aircraft."

The parties differ in their interpretations of the Endorsement. StarNet argues that paragraph 1 of the Endorsement modifies the Policy "by rendering subsection

23

f.(1)(d) of the Pollution Exclusion and subsection j.(5) of the Damage to Property Exclusion inapplicable with respect to claims for bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers or similar agricultural chemicals." StarNet argues that this paragraph of the Endorsement does not modify any other portion of the Policy, and therefore the terms of the Policy "otherwise continue to apply." StarNet argues that, when reading the Policy and the Endorsement together, for claims of bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers, or similar agricultural chemicals, coverage consists of (1) the original coverage under the Policy, and (2) coverage that would otherwise be excluded under subsection f.(1)(d) of the Pollution Exclusion and subsection j.(5) of the Damage to Property Exclusion.

However, StarNet argues, the next portion of the Endorsement, paragraph 2, limits the coverage provided in paragraph 1 of the Endorsement. Specifically, StarNet argues that

> When the plain meaning of the phrase "coverage provided by this endorsement" is applied to this exclusion, Exclusion no. 5 unambiguously excludes <u>any</u> coverage for bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers or similar agricultural chemicals—regardless of whether subsection f.(1)(d) of the Pollution Exclusion or subsection j.(5) of the Damage to Property Exclusion would otherwise apply—if the bodily injury or property damage results from the application of herbicides, pesticides, fertilizers or similar agricultural chemicals by aircraft owned, operated by, rented or loaned to RiceTec or by any non-owned aircraft.

24

StarNet contends that Exclusion (5) in the Endorsement "applies if the 'property damage' results from the application of herbicides by any aircraft."

RiceTec disagrees with StarNet's contention that the Endorsement "purports to provide all of the coverage provided by the main coverage part" and instead argues that, under its plain language, the Endorsement "only provides coverage by nullifying f.(1)(d) of the pollution exclusion and j(5) of the damage to property exclusion for certain injuries when those exclusions would otherwise apply." RiceTec argues that the Endorsement's exclusion 5 does not apply in this case because the claims asserted against RiceTec in the Dishman lawsuit do not fall within subsection (1)(d) of the Pollution Exclusion or subsection (5) of the Damage to Property Exclusion.

If a claim for bodily injury or property damage falls within the terms of (1)(d) of the Pollution Exclusion or (5) of the Damage to Property Exclusion, coverage for that claim is excluded under the plain language of the main part of the Policy. If, however, the claim is for bodily injury or property damage "arising out of the application of herbicides, pesticides, fertilizers or similar agricultural chemicals," then, under the plain language of the Endorsement, neither of those specific exclusions apply, and the claim, which would be otherwise excluded under the Policy, is covered by the Endorsement. But the Endorsement contains its own exclusions. The next section of the Endorsement states: "However, *coverage*

*provided by this endorsement* is excluded for any 'bodily injury' or 'property damage' resulting from" five specific situations, including the application of herbicides by aircraft "owned, operated by, rented or loaned to [RiceTec] or by any non-owned aircraft." (Emphasis added.) The only coverage that the Endorsement provides is coverage for claims for bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers, or similar agricultural chemicals that would otherwise fall within (1)(d) of the Pollution Exclusion or (5) of the Damage to Property Exclusion and therefore would otherwise be excluded by those provisions.

We therefore conclude that under the plain language of the Endorsement, the five exclusions contained within the Endorsement only apply and exclude from coverage certain classes of claims for bodily injury or property damage arising out of the application of herbicides, pesticides, fertilizers, or similar agricultural chemicals that would otherwise fall within (1)(d) of the Pollution Exclusion or (5) of the Damage to Property Exclusion. *See Nasser*, 508 S.W.3d at 257–58 (stating that, when construing insurance policies, courts must determine parties' intent "as reflected in the terms of the policy itself" and that courts must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless"); *Gilbert Tex. Constr.*, 327 S.W.3d at 126 ("Courts strive to honor the parties' agreement and not remake their contract by reading additional provisions

26

into it.”); *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) (“[I]n construing insurance policies ‘where the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction.’”).

Here, the Dishmans asserted claims against RiceTec and other defendants for gross negligence and trespass, and they alleged that the defendants engaged in “an inherently or intrinsically dangerous or ultra-hazardous activity.” Specifically, the Dishmans alleged that on April 23 and 25, 2015, RiceTec, through the conduct of its agent Twin County Air-AG, Inc., “commenced and continued the aerial spraying of herbicide on RiceTec-farmed plots of land adjacent to [the Dishmans’] Property.” The Dishmans alleged that the herbicide supplied by RiceTec and sprayed by Twin County Air-AG “was sprayed, over sprayed, drifted, or was otherwise allowed . . . to come onto” the Dishmans’ property, damaging the Dishmans’ 742-acre rice crop.

RiceTec, as the insured, bore the initial burden of establishing coverage under the Policy. *See Ewing Constr.*, 420 S.W.3d at 33; *Gilbert Tex. Constr.*, 327 S.W.3d at 124. The Policy applies to property damage caused by an occurrence—defined as “an accident”—that takes place in the coverage territory—defined as including the United States—during the policy period if, prior to the policy period, no insured knew that property damage had occurred. The Dishmans alleged that the aerial spraying of herbicides on RiceTec’s property occurred on April 23 and 25, 2015,

which was within the policy period of February 15, 2015, through February 15, 2016. The Dishmans also alleged that RiceTec and its agents negligently sprayed, over sprayed, or allowed herbicides to come onto the Dishmans' property, damaging the Dishmans' young rice crop. The Dishmans thus alleged an "occurrence" that caused "property damage," defined in the Policy as including "physical injury to tangible property." The Dishman lawsuit contained no allegation that, before the policy period, RiceTec knew that property damage had occurred. RiceTec thus initially established that the claims asserted against it in the Dishman lawsuit were covered by the Policy.

The burden thus shifted to StarNet to prove that an exclusion to the Policy applied. *See Ewing Constr.*, 420 S.W.3d at 33; *Gilbert Tex. Constr.*, 327 S.W.3d at 124. StarNet argued that the Endorsement applied and precluded coverage of the claims asserted against RiceTec in the Dishman lawsuit. StarNet argued, as it does on appeal, that it had no duty to defend RiceTec because the Endorsement applied to exclude coverage for the claims asserted in the Dishman lawsuit, and it argued that the exclusions set out in the Endorsement apply to all claims for property damage arising out of the application of herbicides regardless of whether the claim would otherwise fall within (1)(d) of the Pollution Exclusion or (5) of the Damage to Property Exclusion and that the claims asserted in the Dishman lawsuit fell within exclusion (5) of the Endorsement.

RiceTec argues that the claims asserted in the Dishman lawsuit do not fall within either section (1)(d) of the Pollution Exclusion or section (5) of the Damage to Property Exclusion, and, therefore, the Endorsement does not apply and coverage for the claims asserted against RiceTec exists under the terms of the Policy. We do not agree. Section (1)(d) of the Pollution Exclusion excludes from coverage property damage

> arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" . . . [a]t or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

The Dishman lawsuit alleged that herbicide RiceTec, through its agent Twin County Air-AG, aerially sprayed on its own property "was sprayed, over sprayed, drifted, or was otherwise allowed . . . to come onto" the Dishmans' property, causing damage to the Dishmans' rice crop. On appeal, RiceTec argues that the allegations in the Dishman lawsuit were "not limited to the theory that the herbicide seeped, migrated, escaped or was otherwise discharged, dispersed or released from RiceTec's property," but were instead "sufficiently broad to include the theory that the herbicide was sprayed directly upon the Dishmans' rice crops, possibly from above the Dishmans' own property." However, even construing the Dishman lawsuit as alleging that herbicide was sprayed directly onto the Dishmans' rice crops from the

29

RiceTec property—in addition to alleging the drifting of herbicides sprayed onto the RiceTec property to the Dishmans' property—this action still constitutes an actual "discharge" or "release" of pollutants.[3]

Subsection (1)(d) excludes from coverage property damage arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants "[a]t or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the 'pollutants' are brought on or to the premises, site or location in connection with such operations by such insured, contractor, or subcontractor." The Dishman lawsuit alleged that Twin County Air-AG, acting on behalf of RiceTec, aerially sprayed herbicide supplied by RiceTec onto RiceTec's property, and the herbicide—whether sprayed directly onto the Dishman property or sprayed onto the RiceTec property and then traveled to the Dishman property— damaged the Dishmans' rice crop.

RiceTec argues that the facts alleged in the Dishman lawsuit do not fall within subsection (1)(d) because the Dishmans alleged that RiceTec and its agents acted negligently when the herbicide was sprayed onto the Dishmans' property; the Dishmans did not allege that RiceTec "requested or authorized" Twin County Air-

---

[3]     The Policy broadly defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

30

AG to spray the Dishmans' crops. RiceTec argues that, as a result, Twin County Air-AG was not acting on RiceTec's behalf. We disagree with this contention. The Dishman lawsuit repeatedly refers to Twin County Air-AG as RiceTec's agent, responsible for actually conducting the aerial spraying of herbicides on RiceTec's property. It is immaterial that the Dishman lawsuit does not allege that RiceTec requested or authorized Twin County Air-AG to spray *the Dishmans'* crops; what is material is that the Dishman lawsuit alleged that RiceTec engaged Twin County Air-AG to spray its own crops and that, in the course of this activity, the Dishmans' crops were damaged. The Dishman lawsuit thus alleged facts that property damage arose out of the actual "discharge, dispersal, seepage, migration, release, or escape" of pollutants—herbicides—at or from a premises, site, or location, on which Twin County Air-AG, a contractor working on RiceTec's behalf, performed operations—the aerial spraying of cops with herbicides—and the pollutants were brought to the premises in connection with the operations by the insured, RiceTec. The Dishman lawsuit thus alleged facts that fall within subsection (1)(d) of the Pollution Exclusion.[4]

---

[4]    On appeal, RiceTec also argues that subsection (1)(d) of the Pollution Exclusion is inapplicable because neither RiceTec nor Twin County Air-AG was performing operations on the Dishmans' property, and therefore any release of pollutants on that premises does not implicate (1)(d). The Dishman lawsuit does not contain any allegations that RiceTec or Twin County Air-AG conducted any operations on—or over—the Dishmans' property. Instead, the Dishmans alleged that the aerial spraying of herbicide occurred on "RiceTec farmed plots of land adjacent to [the

Under paragraph one of the Endorsement, subsection (1)(d) of the Pollution Exclusion does not apply to claims of property damage arising out of the application of herbicides, pesticides, fertilizers, or similar agricultural chemicals. This paragraph thus brings the claims asserted against RiceTec in the Dishman lawsuit back within the scope of coverage under the Policy. The Endorsement then states, however, that coverage provided by the endorsement is excluded for property damage resulting from "[t]he application of herbicides, pesticides, fertilizers or similar agricultural chemicals by aircraft owned, operated by, rented or loaned to [RiceTec] or by any non-owned aircraft." The language of this exclusion in the Endorsement is broad enough to encompass application of herbicides by aircraft that is owned, or not owned, by RiceTec. The Dishman lawsuit contained no allegations concerning the ownership of the aircraft used in the herbicide-spraying incident, but it undisputedly alleged that the herbicides that damaged the Dishmans' rice crops were applied

Dishmans'] property," and the herbicides were "sprayed, over sprayed, drifted, or [were] otherwise allowed . . . to come onto" the Dishmans' property. However, to the extent the Dishman lawsuit can be read as including an allegation that aerial spraying occurred over the Dishmans' property, leading to herbicides being sprayed directly onto the Dishmans' rice crop, subsection (1)(d) excludes from coverage property damage arising out of the actual "discharge, dispersal, seepage, migration, release or escape" of pollutants at or from *any premises, site, or location* on which the insured or its contractors working on the insured's behalf are performing operations. The Dishmans' property constitutes "any premises, site, or location" on which Twin County Air-AG, RiceTec's contractor working on its behalf, performed the operation of aerial spraying of herbicides.

aerially. The allegations in the Dishman lawsuit thus fall within exclusion 5 in the Endorsement.

We conclude that exclusion 5 contained within the Endorsement operates to preclude coverage of the claims asserted against RiceTec in the Dishman lawsuit. Because the claims in the Dishman lawsuit fall within an exclusion of coverage, as a matter of law, StarNet does not owe RiceTec a duty to defend in the Dishman lawsuit. *See King*, 85 S.W.3d at 187 ("If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured."). We therefore hold that the trial court erroneously granted RiceTec's motion for summary judgment and denied StarNet's motion for summary judgment.

We sustain StarNet's issues on appeal.

## Conclusion

We reverse the trial court's summary judgment ruling that StarNet owed RiceTec a duty to defend in the Dishman lawsuit, and we remand this case for further proceedings consistent with this opinion.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.