# Supreme Court of Texas

══════════

No. 20-0700

══════════

City of Fort Worth, Texas,

*Petitioner*,

v.

Abdul Pridgen and Vance Keyes,

*Respondents*

═══════════════════════════════

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

═══════════════════════════════

**Argued February 1, 2022**

JUSTICE LEHRMANN delivered the opinion of the Court, in which Chief Justice Hecht, Justice Devine, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined, and in which Justice Blacklock joined except as to Part III(A).

JUSTICE BLACKLOCK filed a concurring opinion.

JUSTICE BOYD filed a dissenting opinion.

This case concerns the proper interpretation of a "good faith report[] [of] a violation of law" under the Texas Whistleblower Act. The plaintiffs, two veteran law enforcement officers with the Fort Worth Police Department, contend that they were unlawfully disciplined for

making such a report regarding another officer's conduct. They sued the City pursuant to the Act, which provides for a limited waiver of sovereign immunity. The trial court denied the City's motion for summary judgment, and the court of appeals affirmed, holding that the Act waived the City's immunity. We hold that, as a matter of law, the officers did not make a qualifying "report" under the Act. We therefore reverse the court of appeals' judgment and render judgment for the City.

## I. Background

Abdul Pridgen and Vance Keyes were veteran law enforcement officers employed by the Fort Worth Police Department. Pridgen served as Assistant Chief, Keyes as Deputy Chief. Both supervised the Department's Internal Affairs and Special Investigations Units. The Internal Affairs Unit is responsible for investigating allegations that police officers have violated general orders or other internal Department rules or policies. The Special Investigations Unit investigates allegations of criminal misconduct involving City employees, including police officers. Keyes reported directly to Pridgen, who in turn reported to Chief of Police Joel Fitzgerald.

On December 21, 2016, Jacqueline Craig called the police to report that her neighbor choked her seven-year-old son because he left trash in the neighbor's yard. Officer William Martin responded to the call. When he arrived at the scene, Martin questioned the neighbor and then approached Craig. After Craig explained the incident, Martin asked, "Why don't you teach your son not to litter?" Craig stated that even if her son had littered, her neighbor did not have a right to touch him. Martin responded, "Why not?" Craig exclaimed that Martin should

2

not tell her how to parent her children. Martin stated, "If you keep yelling at me, you're going to piss me off [and] I'm going to take you to jail." As Craig yelled back, her teenage daughter stepped between Craig and Martin. Martin shoved Craig's daughter away, drew a taser, and pressed it against Craig's back, forcing her to the ground. While handcuffing Craig, he pointed the taser at her daughter and told her to get on the ground. When Craig's daughter proceeded to sit, Martin grabbed the back of her neck and pushed her down. He drew her arms behind her back, handcuffed her, and then forcefully lifted her to her feet. As Martin walked Craig and her daughter to his patrol car, Craig's older daughter, Brea Hymond, who had been filming the incident, followed behind him. Once Craig and her younger daughter were inside the vehicle, Martin turned around and grabbed Hymond's arm. He shoved her against the patrol car and, after a struggle, wrested the phone from her grasp. He went on to handcuff her, arrest her, and place her in a second patrol car.

The video was streamed to Facebook Live and went viral. It received substantial negative media attention. Shortly thereafter, the matter was referred to the Internal Affairs Unit, prompting Pridgen and Keyes to begin their investigation. On December 25, 2016, Martin was served with an initial personnel complaint notifying him that he was under investigation for charges including excessive force, unlawful arrest, and discourtesy. On December 28, Pridgen instructed Captain Deven Pitt and Lieutenant Neil Noakes to serve Martin with an additional personnel complaint for violation of the Bias-Free Policing

General Order.[1] Internal Affairs conducted pre-disciplinary hearings on January 7 and 9, 2017.

Pridgen and Keyes reviewed Martin's body camera video, the Facebook Live video, and Martin's arrest affidavit and determined that Martin violated the law and should be terminated. They concluded that Martin used excessive force when he torqued Brea Hymond's arms while she was handcuffed, lied in his arrest affidavit when he asserted that Hymond pushed him from behind, and illegally arrested Craig and her daughters. Both Pridgen and Keyes assert that they conveyed these conclusions to Chief Fitzgerald on multiple occasions prior to Martin's receiving discipline. Keyes claims that he communicated these conclusions once over the phone, once while he was in the Chief's office, and once when Pridgen, Keyes, and the Chief were all in Pridgen's office. Pridgen avers he told Chief Fitzgerald about their conclusions over the phone and during an Internal Affairs meeting that took place the first week of January. Specifically, Pridgen states that at the meeting, Chief Fitzgerald went around the table asking the team what they thought Martin's discipline should be. When the Chief got to Pridgen, Pridgen said, "you don't want to know my opinion." Chief Fitzgerald responded, "no, I do want to know your opinion." Pridgen then stated that Martin should be terminated because he "made a false arrest, he lied in his

---

[1] General Order 347.03, Bias-Free Policing, requires all Fort Worth Police Department officers to "provide[] police services to the community in a nonpartisan, fair, equitable, and objective manner without consideration of race, color . . . or other individual characteristics or distinctions."

4

affidavit and used excessive force." Chief Fitzgerald replied, "you're right, I don't want to know what you're thinking."

Though Chief Fitzgerald agreed that Martin used excessive force, he and several other members of the Internal Affairs Unit disagreed with Pridgen and Keyes about their other conclusions and did not think Martin should be terminated. On January 9, 2017, Chief Fitzgerald suspended Martin for ten days.

On January 26, Martin's previously undisclosed body camera video and other confidential files were released and posted on "theroot.com" and on the Facebook page of Jacqueline Craig's attorney, Lee Merritt. Chief Fitzgerald immediately initiated an investigation into the source of the leak. He later testified that from the beginning, he suspected Pridgen was involved. And though the Chief initially directed Keyes to help identify the leak's source, within a day he notified Keyes that Valerie Washington, the assistant city manager, wanted Keyes and Pridgen removed from the leak investigation.[2] Keyes emailed Chief Fitzgerald and Washington asking why he was removed but received no response.

The remaining Internal Affairs officers concluded that five individuals, including Pridgen, had special authorization to access the body camera video and other leaked materials. Upon further investigation, they discovered that Pridgen had downloaded the files to a thumb drive on January 18. Video footage showed that Keyes was in

---

[2] Washington denies this. In her deposition testimony, she stated that Chief Fitzgerald was the one who wanted Pridgen and Keyes removed from the leak investigation.

5

Pridgen's office at the time of the download. In early February, a forensic examiner with the Department concluded that the files Pridgen downloaded were identical to those posted online.

Pridgen acknowledges downloading the files, claiming that he intended to share the information with Chief Fitzgerald. He also concedes that he cannot produce the thumb drive. Keyes likewise admits that he was in Pridgen's office on January 18. However, both deny that they leaked the files to Merritt, and in his deposition, Merritt denied receiving the files from anyone in the Department.

Keyes and Pridgen were served with personnel complaints on February 14 and February 20, respectively, notifying them that they were under investigation for participating in the leak. In March, they were placed on detached duty, which required them to remain at their residences for eight hours a day. On May 19, Pridgen and Keyes were demoted to Captain. And on May 22, Keyes was suspended for three days without pay.

In November 2017, Pridgen and Keyes each sued the City pursuant to the Whistleblower Act, alleging that the City took adverse action against them in response to their "good faith reports" of "violation[s] of law." TEX. GOV'T CODE §§ 554.001–.002. Specifically, they alleged that Chief Fitzgerald unlawfully removed them from their positions due to their "reports of Officer Martin's violations of law." They sought past and future damages, reinstatement of their previously held positions, restoration of seniority rights and fringe benefits, and attorney's fees. The City filed an answer and general denial in both suits. It also raised several affirmative defenses, including that it

6

"would have taken the action against [the plaintiffs] . . . based solely on information, observation, or evidence that is not related to the fact that Plaintiff[s] allegedly made" the protected report, and that Pridgen and Keyes lacked a good-faith belief that they were reporting a violation of law.

Pridgen and Keyes (hereinafter collectively referred to as Respondents) filed a motion to consolidate their suits, which the trial court granted. The City filed a traditional and no-evidence motion for summary judgment, arguing that Respondents failed to allege jurisdictional facts necessary to show a waiver of sovereign immunity and asking the trial court to render judgment as a matter of law in the City's favor. The City argued that Respondents did not "in good faith report[] a violation of law," as the Whistleblower Act requires, because (1) they merely conveyed "their opinions" regarding the Department's internal policies and the consequences they believed Martin should have faced, and (2) they lacked a subjectively and objectively reasonable belief that Martin violated the law. The City also opined that Respondents failed to produce evidence showing they were fired because of their "report[s]," as opposed to the leak of confidential documents.

In their response to the City's motion, Respondents argued that (1) a question of fact exists regarding whether they reported violations of law in good faith, (2) evidence demonstrates that the City's disciplinary actions were linked to their reports, and (3) a question of fact exists regarding the City's affirmative defense that it had independent grounds to discipline them.

The trial court denied the City's motion, and the court of appeals affirmed. ___ S.W.3d ___, 2020 WL 3286753, at *4–9 (Tex. App.—Dallas June 18, 2020). The court of appeals held that Respondents "report[ed]" a violation of law to Chief Fitzgerald, as required by the Act. *Id.* at *4–5. In doing so, the court rejected the City's arguments that Respondents failed to make a protected "report" because Chief Fitzgerald (1) already knew about Martin's conduct from another source, (2) had already viewed the Facebook Live video, which was public knowledge, and (3) had already ordered an investigation of the incident. *Id.* The court likewise rejected the City's argument that Respondents offered only "opinions about discipline and the consequences of Martin's conduct," which "are simply not the types of 'reports' the [Act] protects." *Id.*

The court of appeals also held that Respondents satisfied the Act's "good faith" requirement because they provided evidence that they possessed an objectively reasonable belief that Martin's conduct violated the law. *Id.* at *5–6. Finally, relying on the causation factors we articulated in *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000), the court held that Respondents "offered evidence from which a jury could conclude that their protected activity . . . at least partially motivated [Chief] Fitzgerald to demote them, and that Fitzgerald would have reached a different decision in the absence of their protected activity." 2020 WL 3286753, at *8.

The City petitioned this Court for review, arguing that it is entitled to judgment on multiple independent grounds, including: (1) Respondents did not "report" under the Act because they did not "disclos[e] . . . information"; (2) the court of appeals erred in relying only

8

on evidence of Respondents' subjective beliefs about the criminal nature of Martin's conduct in determining whether their beliefs were objectively reasonable; and (3) Respondents' evidence was legally insufficient to establish that their discipline resulted from Chief Fitzgerald's unlawful motivation. We granted the City's petition.

## II. Standard of Review

Governmental entities are typically immune from suit unless the state consents through an express legislative enactment. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 746 (Tex. 2019). The Texas Whistleblower Act provides a limited waiver of that immunity. Specifically, Section 554.0035 provides that "[a] public employee who alleges a violation of [the Act] may sue the employing state or local governmental entity," and "[s]overeign immunity is waived and abolished to the extent of liability for the relief allowed under [the Act] for a violation of [the Act]." TEX. GOV'T CODE § 554.0035. Accordingly, the elements of a whistleblower claim are jurisdictional facts necessary for "determining whether the [plaintiff's] claim falls within the jurisdictional confines of section 554.0035." *State v. Lueck*, 290 S.W.3d 876, 882 (Tex. 2009).

Here, the City challenges the existence of these jurisdictional facts through a motion for summary judgment. We review such challenges de novo, considering "the facts alleged by the plaintiff and to the extent relevant, evidence submitted by the parties." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 223 (Tex. 2004) (citing *Tex. Nat. Res. & Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001)). Where the facts underlying the merits and jurisdiction are

9

intertwined, the plaintiff must produce evidence "creat[ing] a fact question regarding the jurisdictional issue." *Id.* at 227–28. At this stage of litigation, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* at 225. Accordingly, here, we must evaluate whether Respondents raised a genuine issue of material fact as to each element of their whistleblower claims under Section 554.002(a) of the Act. *See Lueck*, 290 S.W.3d at 882; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

### III. Analysis

Section 554.002(a) of the Texas Whistleblower Act provides:

> A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

TEX. GOV'T CODE § 554.002(a). The employee bears the burden of proving this claim. *Id.* § 554.004(a).[3] Thus, in a Whistleblower Act suit by a public employee against his governmental-entity employer, the employee must show that he (1) reported (2) a violation of law by the employer or another public employee (3) to an appropriate law

---

[3] If a governmental employer takes adverse action "not later than the 90th day after the date on which the employee reports a violation of law," there is a rebuttable presumption that the action was taken in response to the employee's report. TEX. GOV'T CODE § 554.004(a). Because the relevant adverse actions here occurred approximately five months after Respondents allegedly made their reports, the presumption does not apply.

10

enforcement authority, (4) the report was made in good faith, and (5) the adverse action would not have occurred when it did if the employee had not reported the illegal conduct. *Id.* § 554.002(a); *Zimlich*, 29 S.W.3d at 67 (discussing the required causal link between the report and the adverse employment action).

### A. Qualifying "Report" under the Whistleblower Act

The City primarily argues that Respondents did not make a qualifying "report" under the Act. First, it asserts that "report[ing]" entails "provid[ing] *information*" as opposed to mere opinions or conclusions. Second, it claims that to "report," one must "disclose" facts previously unknown to the report's recipient. It argues that because Respondents conveyed conclusions to Chief Fitzgerald based on facts he already knew, they were merely repeating, not "reporting." Finally, the City argues that to make a protected report, whistleblowers must be "illuminat[ing] some governmental misdeeds" and not "simply doing their jobs." In the City's view, Respondents were executing their assigned task of investigating Martin's conduct, not blowing the whistle.

Respondents urge us to reject these restrictions, which they believe are nowhere to be found in the Act's text. Additionally, they claim that even if we adopt the City's "disclosure" rule, their "report" that Officer Martin committed perjury would comply. In their view, this conclusion was "new" because they were the only ones to convey it to Chief Fitzgerald. Similarly, they contend that they were the only officers who insisted that the Department pursue criminal charges against Officer Martin.

11

As discussed below, we agree with the City that to "report[]" under the Act, an employee must convey information, not just conclusions, and we agree that Respondents largely failed to satisfy this requirement. We disagree, however, that the Act contains an atextual "disclosure" requirement. We also disagree that public employees forfeit the Act's protection if they report as part of their job duties.

We begin by examining the statute's language. When construing statutes, we endeavor to "determine and give effect to the Legislature's intent." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 316 (Tex. 2002) (citations omitted). We must enforce the Act "as written" and "refrain from rewriting the text that lawmakers chose." *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009)). Additionally, while we must necessarily construe key terms, we do so in the context of the statute as a whole, not in isolation. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018).

We first consider the word "report." Because the Act does not define the term, we interpret it according to its common, ordinary meaning unless the statute's language indicates otherwise. *Tex. State Bd. of Examiners of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34 (Tex. 2017) (citation omitted). When determining a statutory term's common, ordinary meaning, we typically consult dictionaries. *Epps. v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011). Common dictionary definitions of "report" slightly vary, and, unsurprisingly, the parties each argue that the definition most favorable to their position controls.

12

Respondents point to Merriam-Webster's "to give an account of" and Cambridge Dictionary's "to give a description of something or information about it to someone." *See Report*, Merriam-Webster, https://www.merriam-webster.com/dictionary/report; *see also Report*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/report. The City, however, cites another Merriam-Webster definition: "to make known to the proper authorities." *See Report*, Merriam-Webster, https://www.merriam-webster.com/dictionary/report. We decline to arbitrarily choose between these definitions but believe they are helpful in "establish[ing] outer boundaries of what [report] could (or could not) mean." Philip A. Rubin, *War of the Words: How Courts Can Use Dictionaries in Accordance with Textualist Principles*, 60 DUKE L.J. 167, 191 (2010) ("[D]ictionaries . . . should be used only to say what a word could mean, not what it must mean—they can only establish outer boundaries."). The common thread throughout these definitions is provision of *information*, as opposed to mere opinions or suppositions. Therefore, we agree with the City that, to "report" under the Act, employees must convey facts. Communicating unsupported opinions or legal conclusions is insufficient.

Respondents urge us to refrain from reading any further restriction into the Act, pointing to opinions from the courts of appeals suggesting that "report" should be construed broadly in light of the Act's failure to otherwise constrain the term. *See, e.g.*, *Tex. Dep't of Assistive & Rehabilitative Servs. v. Howard*, 182 S.W.3d 393, 400–01 (Tex. App.—Austin 2005, pet. denied) (holding that no specific phrasing is required to make a qualifying "report" under the Act); *Montie v. Bastrop County*,

No. 03-16-00123-CV, 2016 WL 6156232, at *6 (Tex. App.—Austin Oct. 19, 2016, pet. denied) (holding that "reports" need not be in writing). Regardless of whether these cases are correct, they pertain only to the *form* a report may take, not its substance. And in interpreting statutes, we look not only to the statutory language, but also to the objective the Legislature sought to attain and the consequences of a particular construction. *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647 (Tex. 2020); *In re Xerox Corp.*, 555 S.W.3d 518, 526 n.48 (Tex. 2018) (citing TEX. GOV'T CODE § 311.023). Indeed, "we consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent." *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017). Therefore, we must consider the context in which "report" appears within Section 554.002 and our own precedent.

In *Neighborhood Centers, Inc. v. Walker*, we explained that the Whistleblower Act was adopted "amidst a growing sense throughout the country that 'mismanagement in the public sector'" was a mounting public concern, and that "employees who disclose mismanagement deserve legal protection." 544 S.W.3d 744, 747 (Tex. 2018) (citation omitted). In light of this history, we concluded that the Act is aimed at "ferreting out government mismanagement to protect the public." *Id.* at 748. Accordingly, the Act is not intended to protect *all* reports; it is intended to protect those that further this purpose.[4] Therefore, to

---

[4] Both the concurrence and the dissent assert that our interpretation goes beyond the Act's text. *See post* at 3 (Blacklock, J., concurring); *post* at 2

14

properly "report" under the Act, a public employee must convey information that exposes or corroborates a violation of law or otherwise provide relevant, additional information that will help identify or investigate illegal conduct.[5]

In so construing the Act, we reject the City's additional proposed constraints on the Act's "report" requirement. First, the City urges us to adopt the Thirteenth Court of Appeals' interpretation of the Act and define "report" as "[a] *disclosure* of information . . . tending to directly or circumstantially prove the substance of a violation of criminal or civil law." *Castaneda v. Tex. Dep't of Agric.*, 831 S.W.2d 501, 503–04 (Tex.

---

(Boyd, J., dissenting). However, by purporting to stick to the Act's plain language, they each reach different conclusions. This is because words are meant to be read in context. *See, e.g.*, *In re Academy, Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021) ("We consider statutes as a whole, reading the chosen words 'in their context and with a view to their place in the overall statutory scheme.'" (citation omitted)). Our interpretation adheres to the Legislature's intent precisely because it considers the statute as a contextual whole.

[5] While not directly relevant to the disposition of this case, we note for clarity that the "good faith" limitation modifies all the Act's components, including the report requirement. TEX. GOV'T CODE § 554.002(a). We have interpreted "good faith" under the Act to have subjective and objective components. *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex. 1996) (holding that to properly report a "violation of law," an employee must personally believe the conduct reported was a violation of law, and the employee's belief must have been reasonable in light of his training and experience). Applying the good-faith restriction to the report requirement as we have construed it, we hold that an employee "reports" "in good faith" when (1) the employee believes the reported information will facilitate identifying or investigating a violation of law by the employing governmental entity or another public employee, and (2) the employee's belief is reasonable in light of the employee's training and experience. *See Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 321 (Tex. 2002) ("[W]hen feasible, we should consistently interpret terms used throughout a statute.").

App.—Corpus Christi 1992, writ denied) (emphasis added), *superseded by statute on other grounds*, TEX. GOV'T CODE § 554.002. "Disclosure," the City says, entails provision of *novel* information. Accordingly, in the City's view, the Act requires that employees possess a good-faith belief that they conveyed previously unknown information to the relevant authority. Redundant reports, even if made by separate employees, would not count.

As discussed, there is no question that "disclosing" new information regarding illegal conduct may qualify as "report[ing] a violation of law." However, we disagree that this is the only type of communication the Act protects. First, the word "disclosure" is conspicuously absent from the Act's text. It likewise does not appear in most dictionary definitions of "report." This is particularly notable in light of the numerous other whistleblower statutes that explicitly employ the word "disclosure," including the federal Act.[6] Our precedent dictates that just as "every word of a statute must be presumed to have been used for a purpose[,] . . . every word excluded from a statute must

---

[6] *See* ARIZ. REV. STAT. ANN. §§ 38-531 to 38-534 (2021); ARK. CODE ANN. §§ 21-1-601 to 21-1-610 (2021); COLO. REV. STAT. §§ 24-50.5-101 to 24-50.5-107 (2021); CONN. GEN. STAT.§ 4-61dd (2021); D.C. CODE §§ 1-615.51 to 1-615.59 (2021); FLA. STAT. § 112.3187 (2021); GA. CODE ANN. 45-1-4 (2021); IDAHO CODE §§ 6-2101 to 6-2109 (2021); IOWA CODE § 70A.28 (2021); KAN. STAT. ANN. § 75-2973 (2021); KY. REV. STAT. ANN. § 61.102 (2021); MD. CODE ANN., State Pers. & Pens. §§ 5-301 to 5-314 (2021); MASS. GEN. LAWS ch. 149, § 185 (2021); MINN. STAT. §§ 181.931–.937 (2021); MO. REV. STAT. § 105.055 (2021); NEB. REV. STAT. § 81-2705 (2021); N.J. STAT. ANN. § 34:19-3 (2021); N.Y. PUB. AUTH. LAW § 2986 (2021); OKLA. STAT. tit. 74, § 840-2.5 (2021); OR. REV. STAT. ANN. §§ 659A.199–659A.236 (2021); WASH. REV. CODE §§ 42.40.010–42.40.910 (2021); WIS. STAT. §§ 230.80–.89 (2021) Whistleblower Protection Act of 1989, Pub. L. No. 101–12, 103 Stat. 21. (2021).

also be presumed to have been excluded for a purpose." *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 260 (Tex. 2018) (citation omitted). Accordingly, we decline to read a limitation into the statute that the Legislature chose to omit.

Additionally, the City's interpretation precludes protection for corroborative reports, which may be equally helpful in "ferreting out government mismanagement to protect the public." *Walker*, 544 S.W.3d at 748. Indeed, the City's argument presumes that once officials receive an initial report of illegal conduct, further, consistent reports add no benefit. But corroboration is eminently valuable when evaluating the reliability of an informant's tip. This is a maxim of federal Fourth Amendment jurisprudence. *See, e.g.*, *Jones v. United States*, 362 U.S. 257, 271 (1960) ("Corroboration through other sources of information reduce[s] the chances of a reckless or prevaricating tale."), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980). It is also common sense. Three consistent accounts of misconduct from three different sources represent far more compelling evidence of wrongdoing than a single report. However, the City's "disclosure" requirement would disincentivize employees from sharing information after an initial report has been made. In fact, even if employees possessed additional evidence, threat of adverse action may chill them from sharing it. Accordingly, the City's disclosure requirement would obstruct the

17

Legislature's goal of addressing misconduct through incentivizing verifiable reports. We reject it.[7]

Finally, the City argues that employees do not "report[] a violation of law" under the Act when they convey information "as part of their jobs." The City warns that holding otherwise would create "a *de facto* class of whistleblowers who are protected simply because they do their job." We similarly reject this interpretation.

Like the "disclosure" limitation, this restriction does not appear in the Act's text. Moreover, the Act's structure and purpose cut against such a limitation. As mentioned, the Act is intended to help "ferret[] out government mismanagement to protect the public." *Walker*, 544 S.W.3d at 748. And the Act protects only "[p]ublic employee[s]" who are "paid to perform services for a state or local governmental entity." TEX. GOV'T CODE § 554.001(4). Indeed, the public employees best equipped to expose, corroborate, or otherwise provide relevant information regarding government illegality are those tasked with investigating misconduct allegations. Moreover, these employees often need the Act's protections most, since they may be *required* to make unpopular reports.

---

[7] That is not to say, however, that employees qualify for the Act's protection merely by repeating stale information or undisputed facts. An employee must in good faith believe the information provided will assist in identifying or investigating a violation of law. Once the governmental authority has conclusively identified, verified, and addressed a prior report of illegality, further reports are unlikely to facilitate these objectives unless they convey new, relevant information. Along the same lines, a report will not fall within the Act's ambit when it merely repeats facts derived from a credible or self-verifying source that is public or broadly available to law enforcement (like a video or police report).

Additionally, though we have never explicitly stated that the Act covers such reports, we have implied as much. In *University of Texas Southwestern Medical Center at Dallas v. Gentilello*, we emphasized that we were *not* holding that a report "can *never* be made internally." 398 S.W.3d 680, 686 (Tex. 2013). To illustrate this point, we provided the following example:

> A police department employee could retain the protections of the Whistleblower Act if she reported that her partner is dealing narcotics to her supervisor in the narcotics or internal affairs division. In such a situation, the employee works for an entity with authority to investigate violations of drug laws committed by the citizenry at large.

*Id.* Accordingly, we found that the fact that employees might discover a violation of law in the course of their professional duties presented no obstacle to seeking the Act's protection. *Id.* Our opinion in *Texas Department of Human Services v. Okoli*, 440 S.W.3d 611 (Tex. 2014), further supports this point. Okoli followed job-specific training in reporting a supervisor's allegedly fraudulent activity. *Id.* at 612–13. Though we held that the agency was immune, we noted that Okoli would have qualified for the Act's protection, even though he reported internally, if he had conveyed information to an official with outward-looking law enforcement authority. *Id.* at 616–17.

## B. Application

We now turn to whether Respondents raised a genuine issue of material fact as to whether they made a qualifying report under the Act. We hold that they did not.

Respondents each communicated with Chief Fitzgerald throughout Martin's investigation. Though they characterize their

19

communications in slightly different ways in their testimony, their briefing provides this summary: "Pridgen and Keyes repeatedly reported to Fitzgerald that Martin had committed crimes of assault, perjury and official oppression and that criminal charges should be pursued."

First, we conclude that these "reports" were not geared toward exposing, corroborating, or otherwise providing information pertinent to identifying or investigating governmental illegality. Respondents did not supply Chief Fitzgerald with new information about Martin's conduct. Rather, Chief Fitzgerald learned about the incident independently through then-Deputy Chief Ramirez. And the record shows that Pridgen, Keyes, and Chief Fitzgerald all had access to the same sources: Martin's body camera video, the Facebook Live video, and Martin's arrest affidavit. Indeed, Chief Fitzgerald, city officials, and news media discussed the Facebook Live video at a press conference two days after the incident. Additionally, Respondents did not corroborate facts that were unverified or subject to dispute. Two videos depict the Craig arrest from multiple perspectives—the Facebook Live video, which was public, and the body camera video, which was available to all members of the Internal Affairs team, including Chief Fitzgerald. And Martin's affidavit, an official law-enforcement record, was similarly available to all parties and reviewed in the course of the investigation.

Nor could Respondents have reasonably believed that they were exposing, corroborating, or otherwise providing new or corroborative information about Martin's conduct. They knew that Chief Fitzgerald

20

was aware of the incident and knew he had access to the same sources of information depicting it.

Second, Respondents' testimony demonstrates an objective not to unearth or prove unlawful conduct, but to persuade Chief Fitzgerald to classify Martin's known actions as criminal conduct and to terminate his employment. To that end, Respondents' communications with Chief Fitzgerald consisted principally of recommendations about the appropriate legal conclusions to be drawn from Martin's actions.[8] For instance, Pridgen claims he told Chief Fitzgerald that "Martin lied in his Affidavit, he made a false arrest, and [he] used excessive force." Similarly, Keyes states he told Chief Fitzgerald that "Brea Hymond had been falsely arrested," "excessive force had occurred," and "Officer Martin had filed a false affidavit." Such statements do not provide relevant information about Martin's actions. Rather, they amount to opinions and conclusions, which the Act does not protect. Other descriptions of Respondents' communications with Chief Fitzgerald pertain to Martin's punishment. But the Act does not protect recommendations about appropriate internal discipline; it protects reports of illegal *conduct*. *Wichita County v. Hart*, 917 S.W.2d 779, 786 (Tex. 1996). Accordingly, Respondents' reports did not aim to expose, corroborate, or otherwise provide information pertinent to identifying or investigating governmental illegality. They merely voiced opinions and

---

[8] To the extent they went beyond recommendations and contained information, they still do not qualify as "reports" for the reasons explained above.

21

encouraged Chief Fitzgerald to assign Martin's actions a particular legal designation.  As such, they do not fall within the Act's purview.

Respondents argue that at the very least, their statements that Officer Martin perjured himself constitute qualifying reports because they were the first to bring Officer Martin's false affidavit to Chief Fitzgerald's attention.  The City disputes this assertion, and Respondents did not testify to that effect in their depositions or declarations.  Even if true, however, the record shows that at most Pridgen and Keyes voiced an *opinion* to Chief Fitzgerald about broadly known (indeed, public) and easily verifiable information.  Accordingly, there were no *facts* for Respondents to expose or corroborate.  Chief Fitzgerald had all the information needed to confirm whether Officer Martin lied, and he knew about the allegation.  Since "reporting" under the Act requires, at a minimum, provision of information regarding illegal conduct, this type of communication does not suffice.[9]

Indeed, as Respondents appear to concede, the purpose of their communications with Chief Fitzgerald was not to help identify or investigate Martin's allegedly illegal conduct.  Rather, they were voicing opinions about how Chief Fitzgerald should classify and punish such behavior.  And while providing these recommendations may have fallen within Respondents' job responsibilities, such opinions and conclusions do not trigger the Act's protections.  Accordingly, we cannot conclude

---

[9] Additionally, it is irrelevant that Respondents were the only ones to recommend that the Department pursue criminal charges against Officer Martin.  Suggesting potential punishment does not equate to "report[ing] a violation of law."

22

that Respondents "in good faith report[ed] a violation of law," and therefore the Act does not apply.[10]

In sum, we hold that Respondents failed to raise a genuine issue of material fact as to whether they "report[e]d a violation of law" under the Whistleblower Act. Therefore, the Act does not waive the City's immunity from suit, and we need not address the City's additional issues regarding the Act's good-faith and causation requirements.

## IV. Conclusion

Respondents failed to present evidence that they "report[ed] a violation of law" under the Whistleblower Act. Therefore, the City retains immunity from suit. We accordingly reverse the court of appeals' judgment and render judgment for the City.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** May 27, 2022

---

[10] We emphasize that we pass no judgment on Respondents' decisions to convey their recommendations to Chief Fitzgerald. That they failed to meet the Act's narrow requirements for whistleblower protection does not mean they acted in "bad faith" as that term is commonly understood. As we explained in *Hart*, an employee's subjective motivations for "report[ing]" are irrelevant for purposes of the Act. 917 S.W.2d at 785–86. An employee motivated by malice toward another individual could qualify for the Act's protection if he reasonably believed the individual violated the law and the report would assist in ferreting out illegality. *Id.* At the same time, an employee with the noblest intentions may forfeit the Act's protections by failing to make a qualifying report to the proper authority. We merely conclude that Respondents' communications are not the type the Act protects.